ENVIRONMENTAL DEFENSE FUND, INC., Plaintiff-Appellant,

v.

Douglas M. COSTLE, as Administrator, U. S. Environmental Protection Agency, et al., Defendants-Appellees.

No. 79–2432.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 14, 1980.

Decided April 21, 1981.

George W. Pring, Denver, Colo., with whom Paula C. Phillips, Denver, Colo., and William A. Butler, Washington, D. C., were on the brief, for appellant.

Lee C. Schroer, Atty., Environmental Protection Agency, and Thomas H. Pacheco, Atty., U. S. Dept. of Justice, Washington, D. C., with whom Angus MacBeth, Deputy Asst. Atty. Gen., and Edward J. Shawaker, Atty., U. S. Dept. of Justice, Washington, D. C., were on the brief, for federal appellees. James W. Moorman, Atty., U. S. Dept. of Justice, Washington, D. C., also entered an appearance for federal appellees.

Dennis Montgomery, Asst. Atty. Gen., Denver, Colo., with whom Evelyn R. Epstein, Asst. Atty. Gen., Phoenix, Ariz., Bruce S. Garber, Asst. Atty. Gen., Santa Fe, N. M., Dallin W. Jensen and Richard L. Dewsnup, Asst. Attys. Gen., for the State of Wyo., Salt Lake City, Utah, Emil Stipanovich, Jr., Deputy Atty. Gen., Los Angeles, Cal., and James V. LaVelle, Deputy Atty. Gen., Las Vegas, Nev., were on the brief, for state appellees.

Before TAMM and ROBINSON, Circuit Judges, and HARLINGTON WOOD, Jr.,* Circuit Judge, United States Court of Appeals for the Seventh Circuit.

Opinion for the court filed by Circuit Judge HARLINGTON WOOD, Jr.

HARLINGTON WOOD, Jr., Circuit Judge:

Plaintiff-appellant, the Environmental Defense Fund, Inc. ("EDF"), seeks review of an order and judgment denying its motion for summary judgment and granting federal and state defendants' cross-motions for summary judgment. EDF challenged certain action and inaction by the Environmental Protection Agency ("EPA"), the Department of the Interior ("Interior"), and the Bureau of Reclamation ("Reclamation")[1] concerning the control and abatement of salinity in the Colorado River. The seven states in the Colorado River Basin—Arizona, California, Colorado, New Mexico, Nevada, Utah and Wyoming—were granted leave to intervene as party defendants.[2]

EDF complains that EPA violated Sections 303(a)–(e) of the Clean Water Act, 33 U.S.C. §§ 1313(a)–(e) (1976 and Supp. III 1979); that both Reclamation and Interior violated Section 201 of the Colorado River Basin Salinity Control Act ("CRBSCA"), 43 U.S.C. § 1591 (1976 and Supp. III 1979); and that EPA, Interior, and Reclamation violated Section 102(2)(E) of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4332(2)(E) (1976 and Supp. III 1979). EDF sought an order from the district court which would have required EPA to promulgate regulations setting forth water quality standards, implementation plans, and waste load allocations for salinity in the Colorado River Basin;

---

* Sitting by designation pursuant to 28 U.S.C. § 291(a) (1976).

1. On November 6, 1979, Reclamation's name was changed to the Water and Power Resources Service. To maintain consistency with past references, the Service will be referred to as "Reclamation" in this opinion.

2. This court affirmed the district court's denial of certain intervention applications. *EDF, Inc. v. Costle,* 79 F.R.D. 235 (D.D.C.1978), *aff'd,* 12 ERC 1255, D.C. Cir. No's. 78–1471, 78–1515, 78–1566 (unpublished per curiam order and memorandum of July 31, 1978), *cert. denied,* 439 U.S. 1071, 99 S.Ct. 840, 59 L.Ed.2d 36 (1979).

and requiring EPA, Reclamation, and Interior to study, develop, and describe alternative methods for salinity control.

EDF alleged six distinct but related claims for relief against three federal defendants regarding salinity levels in the Colorado River. The district court, in an unpublished opinion dated October 3, 1979, entered judgment for the federal and state defendants on all six claims. *Environmental Defense Fund, Inc. v. Costle*, 13 Envir. Rep. (BNA) 1867 (D.D.C. Oct. 3, 1979).

The district court held: in Claim One, that EPA acted reasonably and neither arbitrarily nor capriciously in approving the water quality standards for salinity which were adopted by the seven basin states pursuant to Sections 303(a) and (b) of the Clean Water Act;[3] in Claim Two, that EPA had not acted unreasonably in failing to propose revised or new water quality standards under Section 303(c)(4)(B) for the seven states; in Claim Three, that EPA was not required to promulgate total maximum daily loads ("TMDL's") for salinity for the seven states, Section 303(d)(2); in Claim Four, that EDF's attack upon EPA's alleged failure to remedy inadequate implementation provisions and lack of compliance schedules in the respective states' plans was without merit, Section 303(e)(3)(F); and in Claims Five and Six, that EDF's argument

that the federal defendants had violated Section 201 of the CRBSCA, 43 U.S.C. § 1591 and Section 102(2)(E) of NEPA, 42 U.S.C. § 4332(2)(E), by not studying and implementing alternative salinity controls, was without merit.

This appeal involves a challenge by EDF of the district court's entry of judgment on behalf of the federal and state defendants on all six claims. Also involved are two additional issues related to the proper scope of review for the court and the need for a statement of basis and purpose as required by Section 4(c) of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553(c) (1976 and Supp. III 1979). We affirm the district court's order and entry of judgment on all issues.

## I. THE CLEAN WATER ACT

The Clean Water Act has evolved into its current form after more than thirty years of legislative recognition of technological advancements in the field of water pollution control. The history of the Act and its predecessors, including the Federal Water Pollution Control Act ("FWPCA")[4] and the FWPCA Amendments of 1972,[5] has been detailed in prior opinions construing various portions of the statute.[6] Our summary, therefore, will be limited to the statutory provisions directly involved in this appeal.

---

**3.** Sections of the Clean Water Act are referred to in this opinion by their designations in the Statutes at Large. The parallel United States Code citations for the sections to which most frequent reference is made are as follows:

 Section 208—33 U.S.C. § 1288 (1976 and Supp. III 1979)
 Section 301—33 U.S.C. § 1311 (1976 and Supp. III 1979)
 Section 303—33 U.S.C. § 1313 (1976 and Supp. III 1979)
 Section 304—33 U.S.C. § 1314 (1976 and Supp. III 1979)
 Section 307—33 U.S.C. § 1317 (1976 and Supp. III 1979)
 Section 402—33 U.S.C. § 1342 (1976 and Supp. III 1979)

The parallel United States Code citation for Section 102(2)(E) of NEPA is 42 U.S.C. § 4332(2)(E) (1976 and Supp. III 1979). The parallel United States Code citation for Section

202(a) of the CRBSCA is 43 U.S.C. § 1591(a) (1976 and Supp. III 1979).

**4.** Act of June 30, 1948, ch. 758, 62 Stat. 1155.

**5.** Pub.L.No.92–500, 86 Stat. 816. The 1972 Amendments were updated in the Clean Water Act of 1977. Pub.L.No.95–217, 91 Stat. 1566 (passed Dec. 27, 1977), as codified at 33 U.S.C. §§ 1251 *et seq.* (1976 and Supp. III 1979).

**6.** *See, e. g., E. I. DuPont de Nemours and Co. v. Train*, 430 U.S. 112, 116–21, 97 S.Ct. 965, 969–71, 51 L.Ed.2d 204 (1977); *EPA v. California ex rel. State Water Resources Control Board*, 426 U.S. 200, 202–09, 96 S.Ct. 2022, 2023–26, 48 L.Ed.2d 578 (1976); *American Meat Institute v. EPA*, 526 F.2d 442, 444, 446 (7th Cir. 1975); *Natural Resources Defense Council, Inc. v. Train*, 166 U.S.App.D.C. 312, 510 F.2d 692 (1975), for a summary and explanation of the Act.

## A. Water Quality Standards Under the Clean Water Act

Water quality standards initially appeared in Section 5 of the Water Quality Act of 1965[7] as the primary method of water pollution control. Under the 1965 Act, the standards consisted of three basic elements: (1) a "designated use" such as public water supply, recreational, fish propagation, agricultural, or industrial uses; (2) water quality "criteria" for various pollutants, which are expressed in numeric concentration limits or in narrative form and are sufficiently stringent to protect the designated use;[8] and (3) a plan for the implementation and enforcement of the water quality criteria.[9] The states were each required to adopt water quality standards for the waters within their boundaries, and if they failed to adopt complying standards, the federal government was required to promulgate standards in cooperation with state officials.[10]

The significant role of water quality standards in controlling water pollution was altered by the passage in 1972 of the FWPCA Amendments.[11] The Amendments were enacted, in part, from a recognition in Congress of the lack of efficacy of the existing water quality standards as the major vehicle for pollution control and abatement.[12] The Amendments assigned secondary priority to the standards and placed primary emphasis upon both a point source discharge permit program and federal technology-based effluent limitations (specified maximum levels of pollution allowed to be discharged by an individual source). Clean Water Act §§ 301, 302, 307 and 402. The standards, however, were retained in the newly enacted Section 303, and their use updated accordingly.

## B. Section 303—Overview [13]

Section 303 of the Clean Water Act details the statutory provisions concerning water quality standards and implementation plans. Provisions regarding the maintenance of existing standards are included, as are Congressional mandates to EPA to promulgate regulations establishing standards for a state in the event of a failure to either submit or correct deficient standards. Sections 303(a) and (b). A mechanism for review, update, and revision of the standards is also enumerated. Section 303(c). In addition, the identification of state waters with insufficient controls is required, as is the establishment of maximum daily load limits for certain pollutants. Section 303(d). A continuing planning process must also be instituted. Section 303(e).

## C. Section 208—Introduction

Section 208 of the Act contains provisions for area-wide waste treatment management. The Section requires the identification and designation of areas within the states which have substantial water quality problems. Section 208(a). A continuing areawide planning process must be instituted which results in the formulation of a water quality management implementation plan. Section 208(b).[14] Regional operating agencies must be designated to effect the plan and revise it as necessary. Sections

7. Pub.L.No.89–234, 79 Stat. 903, amended, 84 Stat. 91, as codified at 33 U.S.C. §§ 1151 et seq. (1976 and Supp. III 1979).

8. Section 10(c)(1), 79 Stat. 907, 33 U.S.C. § 1160(c)(1) (1965).

9. Id.

10. Sections 10(c)(1)–(4), 79 Stat. 907, 33 U.S.C. §§ 1160(c)(1)–(4) (1965). See EPA v. California ex rel. State Water Resources Control Board, 426 U.S. 200, 202 n.4, 96 S.Ct. 2022, 2023 n.4, 48 L.Ed.2d 578 (1976).

11. Pub.L.No.92–500, 86 Stat. 816 (1972).

12. Senate Committee on Public Works, 93d Cong., 1st Sess., A Legislative History of the Water Pollution Control Act Amendments of 1972, at 246 (1973) (hereinafter Leg. Hist.).

13. As construction of this section of the Clean Water Act comprises the gravamen of four of EDF's claims, the requisite statutory interpretation and background will appear in our discussion of the respective issues, infra.

14. Our construction of this subsection comprises a significant portion of EDF's Claim Four, infra.

208(c) and 208(d).[15] The regional agencies are primarily responsible for the control and abatement of salinity under the current statutory scheme, as salinity impacts often result from nonpoint sources.

## II. THE COLORADO RIVER SALINITY PROBLEM

### A. Background

The Colorado River flows over 1,400 miles from the Rocky Mountains to the Gulf of California, draining a basin of 244,000 square miles in the United States and an additional 2,000 square miles in Mexico. Portions of seven states lie within the River basin: Colorado, New Mexico, Utah, and Wyoming (chiefly comprising the "upper basin"), and Arizona, California, and Nevada (comprising the "lower basin" or the "lower main stem"). The basin itself has an estimated population of 2,250,000 in the United States portion and an additional 500,000 in Mexico. With the aid of trans-basin diversions, the Colorado provides full or supplemental water for agriculture, industry, and municipal uses for an additional 12,000,000 residents of non-basin population centers such as Denver, Salt Lake City, Cheyenne, Albuquerque, and Southern California.

From a basinwide perspective, salinity is the most significant pollutant in the River.[16] The record indicates that damages to the River and its populace from salinity in the United States portion of the Colorado River system are approximately $53 million annually. By the year 2000, these damages are estimated to reach $124 million annually if control measures are not applied.[17] Disregarding flow variances from year to year, the record also indicates that salinity concentrations will increase progressively if adequate salinity control measures are not effected. These salinity increases will occur due to increased agricultural and industrial use, and trans-basin diversions. Estimates of the present value of salinity damage, through the year 2000, range from $1 billion to $1.5 billion.[18]

It is obvious that salinity in the River is a very significant problem with not only serious impact in the basin, but also indirect consequences far outside the basin. It is deserving of the best efforts of all involved to reach a satisfactory solution.

### B. Salinity Control Efforts to Date

Federal and state salinity control efforts for the Colorado date back twenty years. In an effort to address the salinity problem, the basin states joined with EPA and its predecessor agencies, in enforcement conferences. Studies of the nature of the salinity problem as well as methods to alleviate its significant impact were undertaken. With the passage of the Water Quality Act of 1965, which mandated the states to adopt general water quality standards, the states and federal government began working together to evaluate the feasibility of and need for the development of water quality standards for salinity.[19] The record indicates that in 1971 EPA published a report which recommended that salinity criteria be established at several key locations throughout the River basin. In April 1972,

15. Section 208 also contains provisions which are not of import in this appeal, and are therefore not detailed herein.

16. Salinity is a term which denotes the concentration of dissolved mineral salts and solids in the water. Salinity concentrations of the Colorado increase from the River's headwaters to its mouth. The increase is a result of two basic processes: salt loading (input of salts into the River's waters) and salt concentrating (removal of purer upstream water so that the same tonnage of salts is carried in a lesser quantity of water). Salt loading results from both natural conditions and from human activities. Salt concentrating occurs when water is lost through evaporation or transpiration, or when purer water is either diverted from the basin or is not returned to the River after in-basin use.

17. U.S. Bureau of Reclamation, et al., Final Environmental Statement: Colorado River Water Quality Improvement Program I–12 (1977).

18. Id. at I–21.

19. It should be noted that the promulgation of specific salinity standards was not required by the Act.

EPA and representatives of the seven basin states unanimously recommended, *inter alia,* that: (1) a salinity policy be adopted for the River system having as its objective the maintenance of salinity levels at or below concentrations found in 1972 in the River's lower main stem; (2) treatment of salinity be viewed as a basinwide problem; and (3) a high priority be assigned to certain water quality projects with the objective of achieving stabilization of salinity levels in the lower basin at the earliest possible date.[20]

After passage of the FWPCA Amendments in 1972, EPA, pursuant to Section 303(a)(1), began to review all current state water quality standards. As part of this review, EPA, in January 1973, notified six of the basin states that establishment of complying water quality standards for salinity would be required.[21] In June 1974, EPA proposed regulations establishing its "Salinity Control Policy Standards and Procedures," 39 Fed.Reg. 20703–20704 (June 13, 1974), and after completion of the requisite notice, comment, and hearing procedures, the agency promulgated final salinity regulations in December 1974. 39 Fed.Reg. 43721–43723 (Dec. 18, 1974), 40 C.F.R. §§ 120 *et seq.* (1974).[22] The salinity regulations included three major elements: (1) maintenance of salinity levels in the lower main stem at or below the average level during 1972, 40 C.F.R. § 120.5(b) (1974); (2) adoption by the states of numeric criteria

for "appropriate points" on the River system, 40 C.F.R. § 120.5(c)(1) (1974); and (3) development by the states of a plan to implement the standards, 40 C.F.R. § 120.5(c)(2) (1974). The regulation, in addition, required each basin state to establish specific numeric criteria by October 18, 1975. 40 C.F.R. § 120.5(c) (1974).

In June 1975, prior to the EPA deadline, the Forum issued the "Proposed Water Quality Standards for Salinity Including Numeric Criteria and Plan of Implementation for Salinity Control." This report was modified in August 1975 and was subsequently adopted by each of the basin states as their water quality standards for salinity and related plans of implementation. After a public comment period, EPA, in November 1976, determined that the plans and water quality standards met the requirements of the Clean Water Act. Section 303(c) of the Act requires a review of these standards at least once every three years.

C. *Elements of the State Water Quality Standards for Salinity*

The states' water quality standards for salinity include both narrative and numeric criteria, a plan of implementation, and other factual information on salinity in the Colorado River. The numeric criteria were established at three key points on the lower main stem of the River employing the flow-weighted average annual salinity concentrations for the year 1972.[23, 24]

---

20. EPA, Proceedings of the Reconvened Seventh Session of the Conference in the Matter of Pollution of the Interstate Waters of the Colorado River and Its Tributaries—Colorado, New Mexico, Arizona, California, Nevada, Wyoming, Utah, 215–218 (1972) (hereinafter Proceedings).

21. Pursuant to EPA's determination that salinity standards would be mandated, the seven basin states organized the Colorado River Basin Salinity Control Forum ("Forum") in late 1973. The Forum was established as an interstate mechanism for cooperation among the basin states in the development of water quality standards for salinity.

22. The record indicates that the Forum was instrumental in aiding EPA to propose and ultimately promulgate the 1974 salinity regulation.

23. These values were determined by Reclamation from daily flow and salinity data collected by the U.S. Geological Survey and Reclamation itself. The River system is subject to a highly variable annual flow and these concentration values are calculated to present a standard for comparison based upon an average flow.

24. The criteria are as follows:

| | Salinity in milligrams/liter |
| --- | --- |
| Below Hoover Dam | 723 |
| Below Parker Dam | 747 |
| At Imperial Dam | 879 |

The lower main stem of the River is defined as that portion from Hoover Dam to Imperial Dam. These three points were selected, as the record shows, because of their significant locations. Nevada diverts the Colorado water from Lake Mead for use in the Las Vegas area, and the returns enter the Lake just upstream from

In addition, each basin state adopted a proposal for a water-quality monitoring and analysis program as an integral segment of the standards. The program's purpose is to provide information on a basinwide basis for plan evaluation. Seventeen points on the River were selected to aid in both the measurement of the effectiveness of salinity control projects and programs, and to serve as a continuous informational source of salinity levels throughout the entire basin. The monitoring points are not locations where numeric criteria are established, except at the three key points on the lower main stem. The majority of the points are, in fact, located in the upper-basin. The points are usually the lowest locations near statelines at which measurements are taken on the River's major tributaries.

The water quality standards also include narrative provisions which require salinity to be viewed as a basinwide problem. The provisions' purpose is to maintain salinity at or below 1972 levels found in the River's lowest reaches. Allowances are made, within the narrative provisions, for temporary increases above the 1972 levels, on the condition that control measures to offset such increases are included in the implementation plan.

The water quality standards for salinity also include a plan of implementation (hereinafter "1975 plan"). The plan details various federal and nonfederal projects and programs for the control of salinity; reviews possible future salinity control efforts; provides for review and revision, as needed, of the water quality salinity standards; and estimates model projections of future flow levels, water uses, and salinity levels.[25] The primary goal of the plan is to reduce the salt load of the River. The principal components of the 1975 plan are

as follows:[26] (1) prompt construction and operation of four initial salinity control units authorized by Section 202 of the CRBSCA, 43 U.S.C. § 1592 (1976 and Supp. III 1979); (2) future construction of the twelve other units listed in Section 203 of the CRBSCA, 43 U.S.C. § 1593 or their equivalents after receipt of favorable planning reports; (3) the placing of effluent limitations, principally under the National Pollution Discharge Elimination System ("NPDES"), on industrial dischargers, Clean Water Act, Section 402; (4) the reformulation of previously authorized, but unconstructed, federal water projects to reduce the salt loading effect; (5) the use of saline water for industrial uses whenever practical; and (6) the institution of miscellaneous water user programs and the commencement of future possible salinity control programs. The 1975 plan is categorized into four separate components: (1) control of existing point sources; (2) diffuse source control; (3) irrigation source control; and (4) control of new point sources.

## III. JUDICIAL REVIEW UNDER THE APA

Before turning to the merits of EDF's challenges, we must briefly detail the appropriate scope and standard of review. We must also address the need for preparation of a statement of basis and purpose by EPA, as a prerequisite to approving the state water quality standards for salinity.

### A. Standard of Review

The standard of review when ruling upon a challenge to informal agency action is governed by Section 10(e)(2)(A) of the APA, 5 U.S.C. § 706(2)(A) (1976 and Supp. III 1979), which provides that the reviewing court shall:

Hoover Dam. The gaging station below Parker Dam is immediately downstream of the major Lake Havasu diversion for the Metropolitan Water District of Southern California. Large agricultural areas in the Imperial and Coachella Valleys in California, and the Yuma area in Arizona and California, are served by diversions at Imperial Dam.

25. The streamflow estimates in the plan range from twelve to sixteen million acre-feet, and the depletion levels include water use estimates characterized as low, moderate, or high.

26. The 1975 plan, at ii.

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.... [27]

■ This "arbitrary and capricious" standard of review is a highly deferential one, *Ethyl Corp. v. EPA*, 176 U.S.App.D.C. 373, 541 F.2d 1, 34 (en banc), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976), which presumes the agency's action to be valid.[28] *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971); *National Small Shipments Traffic Conference, Inc. v. C.A.B.*, 199 U.S.App.D.C. 335, 342, 618 F.2d 819, 826 (1980). This standard is viewed as a narrow one, which forbids a court from substituting its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe, supra*, 401 U.S. at 416, 91 S.Ct. at 823; *Montana Power Co. v. EPA*, 608 F.2d 334, 344 (9th Cir. 1979); *Ethyl Corp. v. EPA, supra*, 541 F.2d at 34. The standard mandates judicial affirmance if a rational basis for the agency's decision is presented, *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 290, 95 S.Ct. 438, 444, 42 L.Ed.2d 447 (1974); *Ethyl Corp. v. EPA, supra*, 541 F.2d at 34; even though we might otherwise disagree, *United States v. Allegheny-Ludlum Steel Corp.*, 406 U.S. 742, 749, 92 S.Ct. 1941, 1946, 32 L.Ed.2d 453 (1972).

■ While we are admonished from "rubber stamping" agency decisions as correct, *Ethyl Corp. v. EPA, supra*, 541 F.2d at 34, our task is complete when "we find that the agency has engaged in reasoned decisionmaking within the scope of its Congressional mandate," *American Radio Relay League, Inc. v. F.C.C.*, 199 U.S.App.D.C. 293, 297, 617 F.2d 875, 879 (1980). Thus, we must be assured that the agency action was "based on a consideration of the relevant factors," *Citizens to Preserve Overton Park, Inc. v. Volpe, supra*, 401 U.S. at 416, 91 S.Ct. at 823; and that "the agency has exercised a reasoned discretion, with reasons that do not deviate from or ignore the ascertainable legislative intent," *Ethyl Corp. v. EPA, supra*, 541 F.2d at 35–36, quoting *Greater Boston Television Corp. v. F.C.C.*, 143 U.S.App.D.C. 383, 444 F.2d 841, 850 (1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). Our inquiry into the facts must also be searching and careful, *Citizens to Preserve Overton Park, Inc. v. Volpe, supra*, 401 U.S. at 415–16,[29] 91 S.Ct. at 823.

■ Judicial review of agency *inaction*, on the other hand, is governed by a different standard. In reviewing EDF's Claims Two through Six, we must employ Section 10(e)(1) of the APA, 5 U.S.C. § 706(1) (1976 and Supp. III 1979). This standard provides that the reviewing court shall:

(1) compel agency action unlawfully withheld or unreasonably delayed....

Courts which have construed this standard have found it to consist of either of two issues: (1) whether the agency has violated its statutory mandate by failing to act, *Association of American Railroads v. Costle*, 183 U.S.App.D.C. 362, 373, 562 F.2d 1310, 1321 (1977),[30] or (2) whether the agency's

---

**27.** *See Weyerhaeuser Co. v. Costle*, 191 U.S. App.D.C. 309, 590 F.2d 1011, 1024 (1978); *Ethyl Corp. v. EPA, supra*, 541 F.2d at 33–34; *Sierra Club v. EPA*, 176 U.S.App.D.C. 335, 540 F.2d 1114, 1123–24 (1976), *vacated and remanded sub nom., Montana Power Co. v. U.S. E.P.A.*, 434 U.S. 809, 98 S.Ct. 40, 54 L.Ed.2d 66 (1977).

**28.** The burden of overcoming this presumption is upon the party challenging the agency action. *Mt. Airy Refining Co. v. Schlesinger*, 481 F.Supp. 257, 264 (D.D.C.1979), *citing Udall v. Washington, Virginia & Maryland Coach Co.*, 130 U.S.App.D.C. 171, 398 F.2d 765 (1968),

*cert. denied*, 393 U.S. 1017, 89 S.Ct. 620, 622, 21 L.Ed.2d 561 (1969).

**29.** A searching and careful inquiry is especially important in highly technical cases such as this one. *See American Paper Institute v. Train*, 177 U.S.App.D.C. 181, 543 F.2d 328, *cert. dismissed*, 429 U.S. 967, 97 S.Ct. 398, 50 L.Ed.2d 335 (1976); *Ethyl Corp. v. EPA, supra*, 541 F.2d at 35.

**30.** *See, e. g., Health Systems Agency of Oklahoma, Inc. v. Norman*, 589 F.2d 486, 492 (10th Cir. 1978); *E.E.O.C. v. Liberty Loan Corp.*, 584 F.2d 853, 856 (8th Cir. 1978); *British Airways*

delay in acting has been unreasonable, *Nader v. F.C.C.*, 172 U.S.App.D.C. 1, 520 F.2d 182, 206 (1975) (ten year delay found to be unreasonable).[31] *See also Costle v. Pacific Legal Foundation*, 445 U.S. 198, 200 n.14, 100 S.Ct. 1095, 1108 n.14, 63 L.Ed.2d 329 (1980); *Estate of French v. F.E.R.C.*, 603 F.2d 1158, 1167 (5th Cir. 1979); *E.D.F., Inc. v. Hardin*, 138 U.S.App.D.C. 391, 428 F.2d 1093, 1099 n.29 (1970).

### B. *Scope of Review*

The parties have not disputed the appropriate standards of review. They do disagree as to the proper scope of review, *i. e.*, the extent of the district court's inquiry in its application of the respective standards. At issue is whether the district court properly struck, upon defendants' motion, four

litigation affidavits submitted by EDF in support of its motion for summary judgment on Claim One (EPA's approval of the state water quality standards for salinity).[32]

 It is well settled that judicial review of agency action is normally confined to the full administrative record before the agency at the time the decision was made. The focal point for judicial review should be the administrative record already in existence, not some new record completed initially in the reviewing court. *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *Citizens to Preserve Overton Park, Inc. v. Volpe, supra*, 401 U.S. at 420, 91 S.Ct. at 825; *Doraiswamy v. Secretary of Labor*, 180 U.S.App.D.C. 360, 555 F.2d 832, 839–42 (1976).[33] In addition, *de novo* re-

---

*Board v. Port Authority of New York & New Jersey*, 564 F.2d 1002, 1010 (2d Cir. 1977); *Cockrum v. Califano*, 475 F.Supp. 1222, 1239 (D.D.C.1979) (and the cases cited therein).

**31.** *See, e. g., Blankenship v. Sec'y of H.E.W.*, 587 F.2d 329, 333–36 (6th Cir. 1978); *E.E.O.C. v. Bray Lumber Co.*, 478 F.Supp. 993, 996 (M.D. Ga.1979); *Las Vegas Hawaiian Development Co. v. S.E.C.*, 466 F.Supp. 928, 932 (D. Hawaii 1979); *E.E.O.C. v. Westinghouse Electric Corp.*, 450 F.Supp. 792, 795 (E.D.Mo.1978), *modified*, 592 F.2d 484 (8th Cir. 1979).

**32.** In addition, the state defendants moved to strike several papers submitted to this Court by EDF. The record on appeal should consist of the record before the district court, and should not include information made available subsequent to the date of the decision below. Fed.R. App.P. 10(a), 30(a). Accordingly, we grant the state defendants' motion to strike all papers, and related discussion, that were not before the district court, which are included in the Joint Appendix at 1041–1063, and which are referenced in EDF's reply brief at 22–23. *See Commonwealth of Massachusetts v. U.S. Veterans Administration*, 541 F.2d 119, 123 n.5 (1st Cir. 1976). Appellate review is ordinarily unaffected by matters not contained in the record, *Goland v. C.I.A.*, 197 U.S.App.D.C. 25, 607 F.2d 339, 370 (1978), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980) (per curiam on motion to vacate and petition for rehearing), unless one of the settled exceptions is invoked. *Id.* Since we find each of these exceptions to be inapplicable, including the judicial notice exception, we must grant the motion to strike. *See Landy v. F.D.I.C.*, 486 F.2d 139, 151 (3d Cir. 1973), *cert. denied*, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974).

The two other matters which state defendants moved to strike appeared in EDF's reply brief. One involved the argument in footnote 4 at 7–8, concerning prompt EPA promulgation of water quality standards for salinity. The other involved the discussion at 20–22 related to alleged state refusal to enforce water quality standards through the NPDES program. These must also be stricken because neither was raised in EDF's opening brief nor addressed by defendants in their briefs, and therefore are beyond the scope of argument permitted to be raised in a reply brief. *Mississippi River Corp. v. F.T.C.*, 454 F.2d 1083, 1093 (8th Cir. 1972). See *U.S. v. Bucchino*, 606 F.2d 590, 591 (5th Cir. 1979), *cert. denied*, 446 U.S. 952, 100 S.Ct. 2917, 64 L.Ed.2d 808 (1980); *U.S. Steel Corp. v. Train*, 556 F.2d 822, 839 n.23 (7th Cir. 1977). This is true in the absence of issues of grave public import, *Brennan v. Gilles & Cotting, Inc.*, 504 F.2d 1255, 1266, 27 A.L.R.Fed. 925 (4th Cir. 1974), or where there would otherwise be a miscarriage of justice. *U.S. v. Luther*, 521 F.2d 408, 411 (9th Cir. 1975). Since we find neither, we must strike these matters as well. Were we to rule otherwise, the federal and state defendants would not have had a full and fair opportunity to adequately respond to EDF's later arguments. *U.S. v. Haldeman*, 181 U.S.App. D.C. 254, 559 F.2d 31, 78 n.113 (1976) (en banc, per curiam), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).

**33.** *See F.P.C. v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 331, 96 S.Ct. 579, 582, 46 L.Ed.2d 533 (1976); *Mt. Airy Refining Co. v. Schlesinger, supra*, 481 F.Supp. at 264–70; *Hospital Ass'n of N.Y. State, Inc. v. Toia*, 473 F.Supp. 917, 926–27 (S.D.N.Y.1979); *State of Maryland ex rel. Burch v. Costle*, 452 F.Supp. 1154, 1157 (D.D.C.1978).

view is only allowed under this rule in two limited instances: where the agency action is adjudicatory in nature and the fact finding procedures are inadequate; or where issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action. *Camp v. Pitts, supra,* 411 U.S. at 142, 93 S.Ct. at 1244; *Asarco, Inc. v. U.S.E.P.A.,* 616 F.2d 1153, 1158 (9th Cir. 1980); *Doraiswamy v. Secretary of Labor, supra,* 555 F.2d at 839 n.39.

In the time since *Overton Park* and *Camp v. Pitts,* several rules and exceptions governing the scope of informal agency action have emerged from subsequent decisions. *See Asarco, Inc. v. U.S.E.P.A., supra,* 616 F.2d at 1159. The most noted exception to the general rule occurs where "there was such a failure to explain administrative action as to frustrate effective judicial review." *Camp v. Pitts, supra,* 411 U.S. at 142–43, 93 S.Ct. at 1244. When the record is inadequate, a court may "obtain from the agency, either through affidavits or testimony, such additional explanations of the reasons for the agency decision as may prove necessary." *Id.,* at 143, 93 S.Ct. at 1244; *Doraiswamy v. Secretary of Labor, supra,* 555 F.2d at 842–843. The new materials should be merely explanatory of the original record and should contain no new rationalizations. *Bunker Hill Co. v. EPA,* 572 F.2d 1286, 1292 (9th Cir. 1977). If the agency action, once explained by the proper agency official, is not sustainable on the record itself, the proper judicial approach has been to vacate the action and to remand the matter back to the agency for further consideration. *Camp v. Pitts, supra,* 411 U.S. at 143, 93 S.Ct. at 1244; *Asarco, Inc. v. U.S.E.P.A., supra,* 616 F.2d at 1159.[34]

The Ninth Circuit recently evaluated the "explanation" exception, in a similarly highly technical case, and found the need to look outside the record to determine whether the agency had considered all relevant factors. *Asarco, Inc. v. U.S.E.P.A.,* 616 F.2d 1153 (9th Cir. 1980). The court, in review of an EPA action under the Clean Air Act, 42 U.S.C. §§ 7401 *et seq.* (Supp. III 1979), felt that it could not adequately discharge its duty to engage in a "substantial inquiry" if it were required to "take the agency's word that it considered all relevant matters" as mandated by *Overton Park. Id.* The court resolved its dilemma by stating:

> If the reviewing court finds it necessary to go outside the administrative record, it should consider evidence relevant to the substantive merits of the agency action only for background information, as in *Bunker Hill,* or for the limited purposes of ascertaining whether the agency considered all the relevant factors or fully explicated its course of conduct or grounds for decision. *See Association of Pacific Fisheries* [*v. EPA,* 615 F.2d 794 (9th Cir. 1980)], *supra.* Consideration of the evidence to determine the correctness or wisdom of the agency's decision is not permitted, even when the court has also examined the administrative record. If the court determines that the agency's course of inquiry was insufficient or inadequate, it should remand the matter to the agency for further consideration and not compensate for the agency's dereliction by undertaking its own inquiry into the merits.

616 F.2d at 1160.

The district court found none of the four affiants to be employees of EPA, and that none had participated in the pertinent agency actions. Accordingly, the court declined to apply the exception which would have permitted it to look outside the record. EDF argues that this conclusion has no basis in the APA, its legislative history, or in Supreme Court decisions. We disagree, and find the motion to strike the four liti-

---

34. *See F.P.C. v. Transcontinental Gas Pipe Line Corp., supra,* 423 U.S. at 331, 96 S.Ct. 579, 582, 46 L.Ed.2d 533; *Abbott Laboratories v. Harris,* 481 F.Supp. 74, 78 (N.D.Ill.1979); *Lukens Steel Co. v. Kreps,* 477 F.Supp. 444, 451 (E.D.Pa. 1979); *Philadelphia Council of Neighborhood Organizations v. Coleman,* 437 F.Supp. 1341, 1347–50 (E.D.Pa.1977), *aff'd mem.,* 578 F.2d 1375 (3d Cir. 1978).

gation affidavits to have been properly granted.[35]

EDF asserts that judicial preclusion of presentation of evidence in litigation seeking review of informal agency actions creates a *per se* exclusionary rule which is both unsound as a matter of public policy, and will lead to capricious and ill-founded results. Further, such a *per se* rule, EDF maintains, is inconsistent with *Overton Park's* mandate for review which is thorough and probing, as well as searching and careful. EDF, in essence, calls for the creation of an exception which would enable parties challenging the propriety of informal agency action to submit expert affidavits to the reviewing court to supplement the administrative record. Such affidavits would address the propriety of the agency action.[36]

EDF advocates the creation of an exception which would enable challenging parties to submit affidavits addressing the merits and propriety of the agency decision. The creation of such an exception would be contrary to decisions of the Supreme Court and of this court. There is no occasion for a judicial probe beyond the confines of a record which affords enough explanation to indicate whether the agency considered all relevant factors. *Asarco, Inc. v. U.S.E. P.A., supra,* 616 F.2d at 1160; *Doraiswamy v. Secretary of Labor, supra,* 555 F.2d at 842–43. If anything, a judicial venture outside the record can only serve either as

background information, or to determine the presence of the requisite fullness of the reasons given; and it can never, under *Camp v. Pitts,* examine the propriety of the decision itself.[37] Remand is not necessary, where, as here, we find no need for further explanation of the record.

## C. Statement of Basis and Purpose

■ EDF also avers that EPA violated Section 4(c) of the APA, 5 U.S.C. § 553(c) (1976 and Supp. III 1979), by failing to prepare a statement of basis and purpose prior to approving the state salinity standards and plans of implementation. That failure, EDF alleges, requires both reversal of EPA's actions and remand to the agency. This argument, however, was not raised in EDF's complaint and was not, so far as we can determine, asserted or ruled upon in the district court.[38]

We are mindful of the settled rule that appeals courts should be very hesitant to review issues not addressed in the courts below. *Regents of University of California v. Bakke,* 438 U.S. 265, 283, 98 S.Ct. 2733, 2744, 57 L.Ed.2d 750 (1978) (and the cases cited therein); *Singleton v. Wulff,* 428 U.S. 106, 120–21, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); *Brown v. Collins,* 131 U.S.App. D.C. 68, 402 F.2d 209, 213 (1968). Our choice to resolve this issue is discretionary, *Singleton v. Wulff, supra,* 428 U.S. at 121, 96 S.Ct. at 2877, and is only exercised in extraordinary circumstances not present

**35.** Our determination that the district court took a hard look at the complex evidentiary record and properly concluded on the basis of that record that EPA's challenged actions as to Claim One were not unreasonable, will be detailed in our discussion of Claim One, *infra.*

**36.** EDF disregards the basic reason for the exception—to explain the record where a failure to do so might frustrate effective judicial review. As we indicate in our discussion of Claim One, *infra,* we find the record to be sufficient and therefore any further explanation by agency officials is unnecessary. We also find this appeal to not be properly subject to *de novo* review under either *Camp v. Pitts* exception. *Camp v. Pitts, supra,* 411 U.S. at 142, 93 S.Ct. at 1244.

**37.** EDF also argues that exclusion of the affidavits was improper under both Fed.R.Civ.P. 56

and the Federal Rules of Evidence. Rule 56 and Fed.R.Evid. 402 mandate that affidavits must be relevant to be admissible. As stated, arguments to the merits of an agency action are not relevant when reviewing informal agency action. *E. g., Richards v. Immigration and Naturalization Service,* 180 U.S.App.D.C. 314, 554 F.2d 1173 (1977).

We find EDF's other arguments concerning the propriety of the district court's grant of defendants' motion to strike the four affidavits to be without merit.

**38.** We also note that EDF did not respond in either oral argument or in its reply brief (save mention in one footnote) to defendants' claim that this issue was not addressed in the district court.

here. *See United States v. Aulet*, 618 F.2d 182, 186 (2d Cir. 1980); *Needleman v. Bohlen*, 602 F.2d 1, 4 (1st Cir. 1979); *United States v. Patrin*, 575 F.2d 708, 712 (9th Cir. 1978). Hence, we decline to consider this issue on appeal.

## IV. CLAIM ONE

In Claim One, EDF alleged that the approved water quality standards for salinity, including the implementation plans, failed to comply with the requirements of the Clean Water Act and the Water Quality Act of 1965. EDF also claimed that EPA's approval of the standards in November 1976 was arbitrary and capricious, as well as an abuse of discretion under Sections 303(a) and 303(b) of the Clean Water Act. 33 U.S.C. §§ 1313(a) and (b). EDF also challenged EPA's action on two related grounds. First, EDF asserted that establishment of specific numeric criteria was required for each basin state (including the four basin states within the upper basin). Second, EDF contended that the plan for the implementation of the standards, as adopted by each basin state, was based upon unrealistic assumptions, relied upon insufficient control methods, and contained "patently" ineffective provisions.

In its approval of the water quality standards, EPA was found by the district court to have acted in complete compliance with the Clean Water Act. The court correctly found EPA's actions to be sufficiently explained in the record, and determined that EPA had acted reasonably, and neither arbitrarily nor capriciously in approving the standards. EPA's actions, in approving the standards, had a rational basis in the administrative record and were not contrary to the provisions of the Clean Water Act.

### A. *Sufficiency of the Numeric Criteria*

Pursuant to EPA regulation, each basin state adopted salinity standards which included: specific numeric criteria for three stations in the River's lower main stem, narrative provisions, and other factual information, with the goal of maintaining salinity concentrations below 1972 levels. Included also was a water quality monitoring and analysis program which was consistent with EPA's basinwide approach to the salinity problem. EPA, after a public comment period, approved the standards in 1976.

EPA's review of the standards must ensure that they were consistent with the applicable requirements of the FWPCA, as in effect immediately prior to the date of the enactment of the FWPCA Amendments of 1972. Clean Water Act §§ 303(a)(1), 303(a)(2), and 303(a)(3)(B). *See Montgomery Environmental Coalition v. Costle*, 646 F.2d 568, at 592, 593 (D.C.Cir.1980). This reference back mandated that the state standards were to be evaluated, by EPA, under the provisions of the Water Quality Act of 1965. The test for the adequacy of the standards under the 1965 Act directed that the standards were "to protect the public health or welfare, enhance the quality of water, and serve the purposes of [the] Act." § 10(c)(3).[39]

EDF asserted below that separate numeric criteria were to be established in each basin state and that a failure to do so created a set of salinity standards with no accountability.[40] The district court found that "EDF has not pointed the court to any section of the Clean Water Act that would require the establishment of separate numerical criteria in any basin state." *Environmental Defense Fund, Inc. v. Costle*, 13 Envir.Rep. (BNA) 1867, 1871 (D.D.C. Oct. 3, 1979). EDF also fails to cite any persuasive authority to this court.

Here, EDF details several reasons which it argues necessitate judicial disapproval

---

**39.** The relevant purposes of the 1965 Act were "[t]o enhance the quality and value of our water resources and to establish a national policy for the prevention, control, and abatement of water pollution." Pub.L.No.89–234, § 1(a), 79 Stat. 903.

**40.** EDF did not challenge the adequacy of the three levels of salinity concentration, which were established and approved by EPA, nor did it contend that the designated uses would not be sufficiently protected if such levels were maintained.

and corrective remand of the salinity standards. EDF first contends that the Clean Water Act and corresponding EPA regulations provide that numeric criteria are needed in each of the seven states. To the contrary, neither the Act itself nor the regulations require that any numeric criteria be established. Water quality criteria may be, and often are, totally narrative. EPA's 1974 salinity regulation directed that salinity should be viewed by the states as a basinwide problem, and that numeric criteria be adopted for "appropriate points" on the River, to aid in the maintenance of lower main stem salinity at pre-1972 levels. 40 C.F.R. §§ 120.5(b), 120.5(c)(1), and 120.-5(c)(2) (1974). The regulation, with its requirement of numeric levels at "appropriate points," was promulgated after careful agency study and with complete cognizance of EPA's obligation to protect the public health or welfare, enhance the water quality, and serve the 1965 Act's relevant purposes. If the establishment of numeric criteria in each state became legally mandated after thorough EPA study and review of its statutory obligations, EPA would have been duty bound to promulgate appropriate regulations.

The district court found the narrative and three numeric criteria to be sufficient to meet the 1965 Act's test of adequacy. We agree. The selection of the three points for numeric standards to supplement the narrative provisions is consistent with the basinwide approach and is fully explained in the record.

EDF next assails EPA's alleged change of an official agency position related to the number and location of the "appropriate points" where numeric standards would be set throughout the basin.[41] EDF argues that EPA arbitrarily abandoned its earlier formal position that numeric standards in the upper basin were required by law, and essential in fact, if downstream salinity levels were to be preserved. Such a turnabout, EDF avers, clearly demonstrates the arbitrariness and capriciousness of EPA's approval of the states' standards.

In the years prior to its approval of the state standards in 1976, EPA and the states were in disagreement concerning the proper number and efficacy of points along the River where numeric criteria would be necessary. Certain individuals within the agency were of the view that numeric standards would be required for several key points throughout the entire basin. As detailed earlier, the respective states, the Forum, and EPA combined efforts to develop an amenable solution, which eventually led to the first Federal Register notice of proposed rulemaking in June 1974.[42] The record indicates that a subsequent December 1974 memorandum from EPA's General Counsel stated the EPA "may" legally re-

---

41. EDF also asserts two other minor collateral arguments in support of its claim that specific numeric criteria are required in the four upper basin states. First, EDF argues that upstream criteria are necessary to fully protect the attainment of the standards in downstream waters. The district court found establishment of upper basin numeric criteria to be unnecessary because it determined that salinity did not threaten designated uses of the River in the upper basin states. Since designated uses in the upper basin are not threatened by current downstream salinity levels and because the states and EPA are engaged in a basinwide approach to salinity control and abatement, specific numeric criteria are not needed so long as the basinwide approach is maintained. Salinity control downstream, as the record indicates, is more critical than corresponding upstream measures.

Second, the district court determined that the establishment of upstream criteria was techni-

cally infeasible, as it would be difficult to identify upstream impacts and to correlate them to downstream effects. EDF disagrees with the court's characterization of EPA's task as "technically difficult" because of its belief that upstream standard establishment had been completed ten years earlier by the U.S. Geological Survey and by EPA's own methodology. The district court found the technical difficulties to have been adequately explained in the record, and that EPA's response had been reasonable. We agree, and add that the record details sufficient data to show that the states fully enumerated their belief in both the technical impracticality of upstream criteria and the incompleteness of the EPA data. See the 1975 plan at 60–61.

42. See the text accompanying notes 19–22 supra.

quire each basin state to set "salinity standards" in order to comply with the Clean Water Act and that such standards "may" include numeric criteria. Joint Appendix at 383–384. The final regulation was promulgated, in late December 1974, prescribing numeric criteria at "appropriate points."[43]

EDF maintains that the memorandum from the EPA General Counsel represented a formal agency position, and that the promulgation of the salinity regulation with only three numeric points, and not for each state, was a complete and sudden reversal of EPA's alleged long-standing position. The district court determined that while certain EPA officials had initially advocated numeric criteria for each basin state, EPA took its first formal position upon its promulgation of the salinity regulation in December 1974. We agree. Accordingly, there was no reversal of an official position which would render EPA's actions in approving the standards either arbitrary, capricious, or an abuse of agency discretion.

EDF's argument misconstrues the record, including the General Counsel's opinion, and ignores the evidence which provides a reasonable as well as rational foundation for EPA's approval of the state salinity standards.[44] EDF misconstrues the General Counsel's opinion which stated that EPA *may* legally require the adoption of *salinity* standards which *may* include numeric criteria. EDF construes this opinion to mean that EPA must require establishment of numeric standards for each basin state. This is erroneous, in that the crux of the entire opinion indicates that EPA is *empow-ered* to require basinwide specific numeric criteria, but that it *may* decide that such criteria are not necessary. Further, the opinion calls for adoption of salinity standards, which may or may not include specific numeric criteria to supplement the various narrative provisions.

▮ EPA's approval would survive scrutiny, under the arbitrary and capricious standard of review, even if this court were to construe EPA's early statements which favored implementation of numeric criteria in each state, as collectively representing formal EPA policy. It is well settled that an agency may alter or reverse its position if the change is supported by a reasoned explanation. *See N.L.R.B. v. J. Weingarten, Inc.*, 420 U.S. 251, 264–68, 95 S.Ct. 959, 967–69, 43 L.Ed.2d 171 (1975); *Montana Power Co. v. EPA*, 608 F.2d 334, 347–49 (9th Cir. 1979) (and the cases cited therein); *N.L.R.B. v. International Union of Operating Engineers Local 925, AFL–CIO*, 460 F.2d 589, 604 (5th Cir. 1972). Here, such a reasoned explanation is present in the record.

### B. *The Plan of Implementation*

As a significant segment of the water quality standards for salinity, an implementation plan was also adopted by each state to supplement the requisite numerical criteria and narrative provisions.[45] EDF's primary challenge in Claim One is related to the alleged inadequacies and ineffectiveness of the states' plan, as approved by EPA.

---

**43.** *Id.*

**44.** We find EDF's other arguments concerning alleged concessions by state officials that numeric criteria for upstream locations were necessary, and its redefinition of a "formal" agency position to be without merit.

**45.** We note parenthetically that the current role of a plan of implementation has been recently altered. The requirement for plan inclusion as an element of a water quality standard was deleted by the FWPCA Amendments in 1972. The 1972 Act enumerated separate planning and control procedures under Section 208 and 303(e), 33 U.S.C. §§ 1288 and 1313(e) (1976 and Supp. III 1979).

However, Sections 303(a) and 303(b) still require that a state's initial standards (adopted upon enactment of the 1972 Act) are consistent with the provisions of the 1965 Act. Thus, an implementation plan was necessary as a segment of each basin state's initial water quality standards for salinity, as approved by EPA in 1976. Section 303(c) of the 1972 Act removed the plan as an element of the water quality standards. Accordingly, the states are no longer mandated to continue to include the plan as a segment of the standards, once the separate planning and control procedures of Sections 208 and 303(e) are instituted.

EDF assailed the plan for its erroneous assumptions, its ineffective provisions, and for its alleged focus upon legally insufficient methods of control. The district court examined the administrative record and found the existence of ample evidence supporting EPA's approval of the plan as satisfying the required statutory test "to protect the public health or welfare, enhance the quality of water and serve the purposes of this Act." Section 10(c). For the reasons detailed below, we agree and note that there is sufficient record evidence to support the ruling that EPA's plan approval was not arbitrary and capricious.[46]

EDF first avers that the states' plan was based upon unrealistic assumptions as to streamflow, rates and development in the upper basin, and feasibility of federal funded salinity mitigation projects. EDF contends that the plan overestimates both River streamflow levels and the funding feasibility of federal salinity projects, while simultaneously underestimating development rates in the upper basin.

EDF asserts that the plan, in effect, overstates streamflow levels and understates development (new water depletions) with the end result being an underestimation of expected salinity increases. EDF also complains that the plan was expressly reliant upon an annual streamflow of 15 million acre-feet ("m.a.f."), while the correct figure actually ranged from 13.5 to 13.9 m.a.f. In addition, EDF states that the plan is at odds with recognized authorities as to upper basin development levels. Contrary to these assertions, the district court correctly found the existence of a rational basis in the record to support the states' streamflow estimates, as well as their projection of upper basin development levels.

In effort to meet the Act's requirements, the states formulated the plan to address a range of variable flow levels and development rates within the River basin. The plan itself contains streamflow estimates ranging from 12 to 16 m.a.f., with estimated levels of depletion due to development evaluated for low, moderate, and high degrees of water use. It must be recognized that streamflow estimates may vary among the experts, as may estimates of future levels of depletion. The record evidence indicates that the plan presented enough data to EPA so that their approval cannot be said to be unreasonable. There is also record evidence which demonstrates the existence of a rational basis for EPA to conclude that depletion resulting from development would be low to moderate; with the resultant projected salinity levels being properly maintained under the plan.

As mentioned, the sixteen federal salinity control projects play an integral part in the plan. EDF challenges EPA's plan approval due to the states' assumption that the sixteen federal projects would materialize and function to maintain 1972 levels in the lower main stem. EDF maintains that the assumption was grossly speculative in 1976 because Congress had only authorized and funded four projects, feasibility studies on the remaining twelve projects were problematic, and there was some agency opposition to Congressional project authorization. Through the enactment of the CRBSCA, 43 U.S.C. §§ 1592, 1593, Congress expressed a strong federal commitment to aid in the reduction of River salinity levels via authorizing the construction of the sixteen projects, or their equivalents, in 1974.[47] Such an assumption was not grossly speculative in 1976. The states acted reasonably in 1975 by including the projects as key components within the plan, especially given the fact that the sixteen were the major plan components directed at the control and abatement of natural salinity sources.

Secondly, EDF attacks EPA's plan approval because the plan, "on its face," is allegedly ineffective and will not succeed in

**46.** Since we locate ample record evidence to support EPA's conclusion that the 1975 plan complied with the required statutory provisions, we need not decide whether the Clean Water Act authorizes EPA to either promulgate implementation plans for the states or to require modification of defective plans.

**47.** See the text accompanying notes 14–15 and 26 *supra*.

controlling salinity. EDF avers that the plan excuses violations of the criteria in advance and will not insure the maintenance of the salinity standards beyond 1990.[48]

EDF contends that the plan is short range and does not guarantee maintenance of the standards beyond 1990. EPA's approval of a plan with so short a useful life, EDF argues, is arbitrary and capricious. The district court noted that an entire chapter of the plan addressed future possible salinity controls and provided for review and appropriate modification of the plan every three years. The plan was not vague; and it adequately and reasonably projected salinity control measures through 1990. Thereafter, provisions within the plan itself address the incorporation of updates which may become necessary upon the development of future planning and control technology. We also note that no provision within the Clean Water Act requires that initial salinity standards be unalterable. In fact, the Act itself mandates appropriate revision of the water quality standards once every three years. Section 303(c). Hence, EPA's approval here cannot be considered to be arbitrary and capricious.

EDF also contests the plan's effectiveness because it allows for advance violations of the standards. Such violations are an actual narrative segment of the salinity standards. The violations are included to provide for temporary increases above the 1972 numeric levels on the condition that control measures to offset such increases are also contained within the plan itself. We find that provision for these temporary violations, as explained in the record, is proper, given the highly variable annual flow of the River, and the fact that the control projects may not come on line as soon as originally contemplated.

Third, EDF argues that the plan relied upon insufficient methods of control by ignoring non-structural on-farm approaches and other agricultural methods. EDF contends, in essence, that the plan erroneously excluded on-farm methods which are allegedly more effective than currently employed practices.[49] This allegation is contradicted by the record. The plan contained many non-structural projects. These projects utilize on-farm methods as a means of reducing salinity resulting from irrigation return flows as well as existing irrigation practices. The plan reasonably considers the requisite on-farm measures.[50]

EDF avers that the plan ignores what EDF believes are the most effective and economic control measures available. Such disregard, EDF argues, has no rational basis in the law or in sound planning. While the record is indicative that on-farm techniques offer significant potential for the control and abatement of salinity, it also reveals that such measures are not always the most plausible or cost-effective controls, and alone would be insufficient to maintain the numeric criteria at 1972 levels. Given our limited scope and standard of review, we cannot say that the propriety of the plan's use of on-farm techniques, as approved by EPA, has been unreasonable or irrational. See *Ethyl Corp. v. EPA, supra*, 541 F.2d at 34.

48. EDF's argument here concerning the alleged omission of water quality criteria for the four basin states is without merit because such criteria are not legally required.

49. On-farm techniques include irrigation scheduling and management, improved application methods, recycling irrigation runoff, reorienting field topography, and seepage reduction.

50. The plan considers such measures through: analysis of the efficacy of irrigation canal lining and field drainage systems; reformulation of previously authorized but unconstructed federal water projects aimed at reducing salt loading from irrigation return flows; the continued use of irrigation management services and water systems improvement programs; the institution of strict effluent limitations for certain irrigation point sources through the use of NPDES permits; the employment of the United States Department of Agriculture to research irrigation application rates and to evaluate the magnitude of various program inputs which are needed to provide definitive appraisals of possible contributions to the reduction of River salinity; incorporation of areawide waste management plans under Section 208; and through identification of other non-federal measures. As we noted earlier, the monitoring points are also a factor to be utilized to evaluate on-farm methods.

## C. Discussion

Before turning to EDF's second claim, we make four brief observations. First, we are mindful that the scope and standard of review of the legal and practical need for specific basinwide numeric criteria and a related implementation plan is quite narrow as well as highly deferential. *See generally Ethyl Corp. v. EPA, supra*, 541 F.2d at 34. There is a presumption of validity to EPA's determination that the numeric criteria are not required in each basin state, and to the agency's ultimate approval of the state salinity standards and implementation plans. *Id.* EDF has not met its burden of overcoming this presumption. *See Mt. Airy Refining Co. v. Schlesinger, supra*, 481 F.Supp. at 264. A rational basis for EPA's actions is present in the record, and we conclude that the agency has engaged in reasoned decisionmaking which was based upon a consideration of all relevant factors. *Citizens to Preserve Overton Park, Inc. v. Volpe, supra*, 401 U.S. at 415–16, 91 S.Ct. 823. *See Citizens to Save Spencer County v. U.S.E.P.A.*, 195 U.S.App.D.C. 30, 600 F.2d 844, 886 n.212 (1979).

Second, we note that deference must be accorded to EPA's interpretation of the Clean Water Act. *Board of Governors of the Federal Reserve System v. First Lincolnwood Corp.*, 439 U.S. 234, 99 S.Ct. 505, 58 L.Ed.2d 484 (1978); *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *N.R.D.C., Inc. v. S.E.C.*, 196 U.S.App.D.C. 124, 606 F.2d 1031, 1050 n.24 (1979).[51] And, when judicial construction of EPA's own regulation is in issue rather than a statute, our deference is even more clearly in order. *Udall v. Tallman, supra*, 380 U.S. at 16, 85 S.Ct. at 801. Thus, we are obliged to view EPA's statutory and regulatory interpretation, and subsequent response to the Colorado River's salinity problem, with deference. Since we find that EPA acted within the scope of its authority, our task here is complete.

Third, EDF would have us dissect the Act in an effort to find the need for basinwide criteria and a more efficacious implementation plan. This we decline to do. Courts have held that the Clean Water Act is to be given a reasonable interpretation which is not parsed and dissected with the meticulous technicality applied in testing other statutes and instruments. *N.R.D.C., Inc. v. Costle*, 184 U.S.App.D.C. 88, 564 F.2d 573, 579 (1977). *See Consolidation Coal Co. v. Costle*, 604 F.2d 239, 243 (4th Cir. 1979), *rev'd on other grounds*, 449 U.S. 64, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980). In addition, any ambiguities as to the EPA Administrator's powers under the Clean Water Act are to be resolved in his favor. *E.I. DuPont de Nemours & Co. v. Train*, 430 U.S. 112, 128–29, 97 S.Ct. 965, 975, 51 L.Ed.2d 204 (1977); *Inland Steel Corp. v. EPA*, 574 F.2d 367, 373 (7th Cir. 1978).

Last, we confirm that the standards as approved by EPA were sufficient under the adequacy test espoused in the 1965 Act.[52] The salinity standards protect the public health and welfare, enhance water quality, and serve the relevant purposes of the Clean Water Act. The district court advanced a conclusion in its discussion of Claim One, with which we agree:

> [EDF's] challenge to the states' plan of implementation amounts to a plea that there is a "better" way to control salinity than that followed by the states and approved by EPA. It is not the function of the court, however, to establish a preference between conflicting approaches to salinity control in the Colorado River. The court may not substitute its judgment for that of EPA so long as the agency's actions met "minimum standards of rationality," as they have here (citation omitted).

*Environmental Defense Fund, Inc. v. Costle*, 13 Envir.Rep. (BNA) 1867, 1873 (D.D.C. Oct. 3, 1979).

---

**51.** *See International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. Daniel*, 439 U.S. 551, 566 n.20, 99 S.Ct. 790, 800 n.20, 58 L.Ed.2d 808 (1979) (and the cases cited therein); *Weyerhaeuser Co. v.*

*Costle*, 191 U.S.App.D.C. 309, 590 F.2d 1011, 1025–28 (1978); *Lukens Steel Co. v. Kreps*, 477 F.Supp. 444, 448–51 (E.D.Pa.1979).

**52.** *See* the text accompanying note 39 *supra*.

## V. CLAIM TWO

In Claim Two, EDF argued that EPA's continued failure to promulgate revised or new salinity standards under the Clean Water Act, Section 303(c)(4)(B), 33 U.S.C. § 1313(c)(4)(B), was unreasonable as well as an abuse of discretion.[53] EDF prayed for the issuance of an order from the district court which would have directed EPA to promptly promulgate the revised or new standards. The district court properly determined that EPA had acted neither unreasonably nor with an abuse of discretion by failing to propose revised or new water quality standards for salinity.

EDF's Claim is based upon Section 303(c)(4)(B) which provides:

(4) the Administrator shall promptly prepare and publish proposed regulations setting forth a revised or new water quality standard for the navigable waters involved—

\* \* \* \* \* \*

(B) in any case where the Administrator determines that a revised or new standard is necessary to meet the requirements of this chapter.

EDF avers that EPA has not promulgated revised or new standards, when such standards are in fact necessary to counteract the alleged deficiencies in the states' 1975 plan and current 1978 revision. Since we determined in Claim One that the 1975 plan was not deficient, this argument is without merit.

The gravamen of EDF's Claim below involved an argument that because "new information" had become available since 1976, which was allegedly indicative of the need for revised or new salinity standards, EPA's failure to act under Section 303(c)(4)(B) was unreasonable and an abuse of discretion.

This information consists of evidence which arguably proved the inadequacy of the respective states' 1975 implementation plan.[54] However, alleged deficiencies within the plan do not render the current standards (now consisting of only numeric and narrative criteria and designated uses) inadequate, in that implementation plans are no longer to be included in the revised or new water quality standards.[55] Given that EDF's newly presented information does not include any evidence which would require the promulgation of either revised or new criteria or uses in order to meet the Act's requirements, EPA's inaction cannot be considered as improper.

The district court correctly enumerated three supplemental factors which it utilized in reaching its outcome. The first factor was that the 1972 numeric criteria for salinity had not been exceeded during 1975, 1976, or 1977. EDF assails the court's reliance upon this fact due to its belief that significant increases in salinity levels are imminent. Such potential increases, even if substantiated, cannot be considered to render the district court's reliance upon them erroneous. The only issue below was whether EPA acted unreasonably, or with an abuse of discretion, by not affecting a discretionary determination that revised or new salinity standards were necessary in or before 1977. Thus, post-1977 increases have no bearing upon the propriety of EPA's failure to act and can be adequately addressed, if in fact they do occur, in subsequent standard revisions under Section 303(c)(1).

The second factor is that unexpectedly slow development in the upper basin had tended to offset the phenomenon that the federal salinity control projects had not

---

**53.** EDF also argued below, as part of Claim Two, that EPA failed to act as allegedly required by Section 303(c)(4)(A) of the Clean Water Act. This Section mandates that EPA promulgate revised or new water quality standards if a revised or new standard submitted to the agency for its approval under Section 303(c) is determined to be inconsistent with the Act's requirements. Since the basin states have not yet submitted revised or new standards for EPA approval, the agency is under no duty to act under Section 303(c)(4)(A).

**54.** Included was a presentation of evidence which addressed the plan's sixteen salinity control projects, as well as the plan's alleged lack of cognizance of on-farm methods.

**55.** *See* note 45 *supra*.

come on line as quickly as had been originally anticipated. The record indicates that the effects of these two facts logically tend to cancel each other, especially given the certainty that numeric criteria had not been exceeded during the three years preceding EDF's filing of its complaint.

The court noted, as its third factor, that to mandate EPA intercession at that time would breach the orderly state review process, as required by the Act itself. Section 303(c)(1). EDF argues that neither the Act nor the related regulations excuse EPA from its Section 303(c)(4)(B) duties, in light of the States' respective Section 303(c)(1) duties. While this is correct in principle, it is logical that EPA should refrain from acting until the states have completed an initial effort to update the standards as they deem appropriate. For EPA to intercede prior to the initial completion of the state review process would also disserve the mandate within Section 101(b) of the Clean Water Act, 33 U.S.C. § 1251(b) (1976 and Supp. III 1979). This section recognizes the Congressional policy of placing "primary" responsibility with the states "to prevent, reduce, and eliminate" water pollution.[56] EPA's task of determining the need for revised or new salinity standards to meet the Act's requirements would be greatly simplified by its temporary deference.

We note that EPA has not violated its statutory mandate by failing to act, nor has its delay in acting been unreasonable. Under this court's limited standard of review,[57] it cannot be said that the district court erred by not ordering agency action unlawfully withheld or unreasonably delayed, pursuant to Section 10(e)(1) of the APA, 5 U.S.C. § 706(1).

## VI. CLAIM THREE

EDF asserted in Claim Three that EPA failed to promulgate total maximum daily loads ("TMDL's") for salinity, in violation of Section 303(d) of the Clean Water Act.[58] The district court correctly found the Claim to be without merit.

Section 303(d) involves a complex statutory scheme which requires the states to identify waters where point source controls alone will be insufficient to implement the water quality standards applicable to such waters. The Section obligates the states to establish the TMDL's in accordance with a priority ranking based upon both the severity of the pollution and the water's designated uses. The TMDL's set the maximum amount of a pollutant which can be contributed into a stream segment without causing a violation of the water quality standards. The TMDL's can then be allocated by insertion into NPDES permits, among the various point source dischargers upon the stream segment, taking into account nonpoint source impacts as well.

The states are to submit the respective TMDL calculations for EPA approval, Section 303(d)(2), within one hundred and eighty days of the date of the Administrator's publication of the initial Section 304 identification of the respective pollutants. EPA is to review the TMDL identification and levels, and either approve or disapprove them as appropriate. *Id.* EPA approval will then result in the incorporation of the TMDL's into the state water quality management plans under Section 303(e).[59] Disapproval, on the other hand, mandates the identification and establishment of TMDL's, by EPA, which are determined to be necessary to implement the applicable water quality standards.

**56.** Notably, the legislative history indicates that Congress desired that "the Administrator [is] to work closely with the states to obtain approved standards before he promulgates standards for any waters." See Leg. Hist., *supra* note 12 at 792.

**57.** *See* the text accompanying notes 30–31 *supra.*

**58.** For an in depth discussion of Section 303(d), *see* 43 Fed.Reg. 60662, *et seq.* (Dec. 28, 1978).

**59.** The record indicates that a water quality management plan is a nonstatutory term utilized by EPA in its regulations to reference to the state and areawide plans for the control and abatement of pollution from both point and nonpoint sources. *See* 40 C.F.R. § 35.1521–1 (1979).

EDF avers that the waters were not properly identified and the proper TMDL's were not correctly established. Thus EPA must be ordered to exercise its mandatory duties of identification of insufficient waters and TMDL establishment. The district court based its finding that this contention is without merit upon two reasons. First, the court ruled that the request for such an order was premature because EPA did not identify such pollutants until December 28, 1978, 43 Fed.Reg. 60662.[60] Therefore, the states' duty to submit TMDL calculations, as the court noted, did not arise until June 28, 1979. Section 303(d)(2). *See Homestake Mining Co. v. U.S.E.P.A.*, 477 F.Supp. 1279 (D.S.D. 1979). Since EPA did not have the occasion to approve or disapprove the state TMDL submissions prior to the time of EDF's filing of its motion for summary judgment, we agree that this claim is premature.[61] Thus, it would be improper for us to review EPA's action or alleged inaction at this time. In addition, as the state defendants note, the court would be required to review the states' priority rankings before it could properly review EPA's decision not to establish TMDL's for a specific pollutant such as salinity.

The district court also relied upon the fact that the salinity standards are currently being met. EDF correctly argued below that TMDL's are occasionally employed to prevent *anticipated* violations of the water quality criteria. The court countered this observation, however, by finding that average salinity levels had been decreasing since 1972, and there was no likelihood of any anticipated violations in the immediate future. Hence, the court ruled that an order directing EPA to establish salinity TMDL's in the basin states would not be warranted. We agree. If salinity concentrations were to rise and future violations were anticipa-

ted, the states or EPA, in their respective review processes, could establish TMDL's as necessary to comply with Section 303(d).

Our affirmance of this Claim is further strengthened by the record evidence which indicates that under two percent of the salinity concentration is currently subject to the Section 402 NPDES permit program. Thus, the effect of placing TMDL's for salinity upon the specific numeric criteria is minimal at best. EPA and the states have acted reasonably and in compliance given our limited standard of review under Section 706(1) of the APA. However, we admonish EPA to approve or disapprove such identification, prioritization, and load limits within the requisite statutory framework and time limits. While review of EPA's action is now premature, we urge EPA to carefully heed the statutory deadlines in the future.

## VIII. CLAIM FOUR

██ In Claim Four, EDF assailed EPA inaction as violative of Section 303(e) of the Clean Water Act. EDF alleged that EPA had unreasonably failed to either disapprove or remedy the basin states' continuing planning processes ("CPP's") under Section 303(e). The state CPP's, EDF asserts, have not resulted in water quality plans which have provided adequate implementation provisions and compliance schedules for salinity. Section 303(e)(3)(F). Thus, EPA would be duty bound to sanction states which had not submitted a complying CPP. Section 303(e)(2). The district court determined that EDF's reliance upon the cited statutory provision was clearly misplaced. We agree and find EPA's inaction has not been unlawfully withheld or unreasonably delayed. APA Section 10(e)(1), 5 U.S.C. § 706(1).

---

**60.** We note that EPA was ordered not to delay in its initial pollutant identification by Judge Sirica. *Bd. of County Comm'rs of Calvert County v. Costle*, No. 78–0572 (D.D.C. June 20, 1978) (unpublished order). This order resulted in the identification which appeared at 43 Fed. Reg. 60662 (Dec. 28, 1978).

**61.** EDF also alleges that salinity had previously been identified for TMDL calculation in EPA's earlier water quality documents. This position must fail, as it is meritless and inconsistent with EDF's complaint which details EPA's failure to identify salinity pollutants and to establish sufficient TMDL's.

Section 303(e) obligates each state to prepare CPP's which are consistent with the Act's many requirements, and which establish strategies for the development of water quality management plans.[62] These plans are developed according to EPA regulations promulgated to implement Sections 106, 208, and 303 of the Act. 40 C.F.R. §§ 35.1500 *et seq.* (1979). The plans' primary purpose is to combat nonpoint sources of pollution. The statutory provisions for EPA review and approval of the CPP's and the implementation plans themselves are found in Sections 303(e)(2) and 208(b)(3) respectively. The CPP's are to include, *inter alia*: effluent limitations and standards, TMDL's for pollutants, revision procedures, adequate implementation procedures for revised or new water quality standards under Section 303(c), and the incorporation of all elements of any applicable areawide waste management plans. Section 303(e)(3). Thus, the water quality management plans and the CPP's are separate but complementary in effect, as the continuing planning process often results in the development and update of the management plans.

EDF claims that the basin states' CPP's are inadequate due to alleged deficiencies in the states' 1975 implementation plans. EDF argues that the salinity implementation plan, promulgated under Sections 303(a) and 303(b), is a part of the water quality management plans under both Sections 208 and 303(e) as well as under related EPA planning regulations, 40 C.F.R. §§ 35.-1500, 35.1503(g), and 35.1509-3 (1979). To the contrary, our reading of the regulations and of Sections 208 and 303(e) indicates that the plan of implementation contained within the water quality standards is *not* a part of the water quality management plans. The implementation plan included in the water quality standards was adopted pursuant to Sections 303(a) and 303(b), as originally mandated by the 1965 Act, while the water quality management plans were adopted pursuant to Sections 208 and 303(b). Moreover, the plan referenced in the regulations refers to the implementa-

tion of the water quality management plan and continuing planning processes, while the plan required by Sections 303(a) and 303(b) goes to the implementation of the water quality standards. Hence, different implementation plans involving diverse statutory schemes are present.

Further, Section 303(e)(3)(F) mandates that water quality management plans should include adequate implementation provisions for "revised or new" water quality standards under Section 303(c). The district court noted that the basin states' salinity standards are *not* revised or new standards adopted pursuant to Section 303(c), but are in fact existing standards adopted and approved pursuant to Sections 303(a) and 303(b). Thus, EDF's reliance upon Section 303(e)(3)(F) is misplaced.

## IX. CLAIMS FIVE AND SIX

■ EDF also presented two claims concerning statutory mandates requiring federal defendants to evaluate and develop alternatives to recommended courses of action. EDF argued, in Claim Five, that Interior and Reclamation failed in their duty to develop alternatives to current salinity control programs as required by Section 201 of the Colorado River Basin Salinity Control Act ("CRBSCA"), 43 U.S.C. § 1591. In Claim Six, EDF alleged that EPA, Interior, and Reclamation had violated Section 102(2)(E) of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4332(2)(E) by failing to institute alternative salinity management measures.

Aside from the oft-litigated requirements of NEPA Section 102(2)(C), 42 U.S.C. § 4332(2)(C) involving the preparation and filing of an environmental impact statement ("EIS"), is Section 102(2)(E), 42 U.S.C. § 4332(2)(E), which requires the development and analysis of alternatives apart from those usually found in an EIS. Section 102(2)(E) requires all federal agencies to:

(E) study, develop, and describe appropriate alternatives to recommended courses

**62.** *See* note 59 *supra.*

of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.

Section 201(a) of the CRBSCA, 43 U.S.C. § 1591(a), contains similar requirements. The CRBSCA outlines specific duties which Interior and Reclamation must follow, and which are designed to implement the conclusions and recommendations reached at the April 1972 Water Pollution Conference of the seven basin states. CRBSCA § 201(a).[63] See also CRBSCA §§ 203(b) and 208, 43 U.S.C. §§ 1593(b) and 1598 (1976 and Supp. III 1979). The conclusions and recommendations state, inter alia, that efforts of both Reclamation and Interior: [64]

> [s]hould be considered as an open-minded and flexible program. If alternatives not yet identified prove to be more feasible, they should be included as part of the program, and if elements now included prove not to be feasible, they should be dropped. In addition, it should be recognized that there may be other programs which could reduce the river's salinity. Since present levels are greater than desirable, an effort should be made to develop additional programs that will obtain lower salinity levels.

The essence of EDF's two claims is its belief that "on-farm management practices" should be instituted as the alternative to control the salinity problems on the Colorado River. Accordingly, EDF believes that the federal defendants have not sufficiently developed and utilized on-farm methods such as irrigation scheduling and management, improved application methods, recycling irrigation runoff, reorienting

field topography, and seepage reduction. This analysis and implementation of such on-farm techniques, EDF argues, is legally mandated by NEPA Section 102(2)(E) and by CRBSCA Section 201(a).

In Claim Five, the court correctly decided that on-farm management measures were not alternatives to Interior's and Reclamation's CRBSCA salinity control efforts, but comprised instead, an integral part of the program itself. There is evidence in the record which exhibits the defendants' interest in the development and use of on-farm measures. EDF has not established any facts which would activate the "study of alternatives" requirement within the CRBSCA. On-farm techniques comprise an integral segment of Interior's and Reclamation's existing salinity control program and do not, as EDF asserts, represent alternatives to such a program. The record details several instances where on-farm methods have been evaluated, including the final EIS of the program itself,[65] as well as a progress report issued subsequent to the filing of the EIS.[66] Further, Interior and Reclamation, as the record shows, have developed all alternative and supplemental methods currently mandated by the CRBSCA.

This same record evidence is supportive of the district court's resolution of Claim Six. Section 102(2)(E) of NEPA is inapplicable to Claim Six, because on-farm measures currently employed by EPA are not "alternatives" to the agency's salinity control program. Rather, the measures constitute an integral segment of the program. The district court found the existence of record evidence indicative of the fact that

**63.** Section 201(a) of the CRBSCA provides as follows:

> § 1591. Implementation of salinity control policy
> (a) The Secretary of the Interior shall implement the salinity control policy adopted for the Colorado River in the "Conclusions and Recommendations" published in the Proceedings of the Reconvened Seventh Session of the Conference in the Matter of Pollution of the Interstate waters of the Colorado River and its Tributaries in the States of California, Colorado, Utah, Arizona, Nevada, New Mexico, and Wyoming, held in Denver, Colorado,

on April 26–27, 1972, under the authority of section 1160 of Title 33, and approved by the Administrator of the Environmental Protection Agency on June 9, 1972.

**64.** Proceedings, supra note 20 at 172–73.

**65.** See U.S. Bureau of Reclamation, et al., Final Environmental Statement: Colorado River Water Quality Improvement Program (1977).

**66.** U.S. Dep't of Interior, Quality of Water Colorado River Basin, Progress Report No. 9 (Jan. 9, 1979).

EPA had been studying, describing, and developing on-farm management measures for the control and abatement of salinity. In addition, EDF has failed to sufficiently identify to this court, any "recommended courses of action in any proposal" which would obligate EPA, Interior, or Reclamation to embark upon further study, development, or description of alternatives. EPA's approval of the basin states' salinity standards can hardly be classified as a proposal, nor can its possible disapproval and repromulgation of a deficient standard. Under the Clean Water Act, a standard proposed by EPA consists of a designated use and appropriate numeric and narrative criteria. Thus EPA would have no authority to consider on-farm alternatives. Moreover, the broad EPA salinity control program is not classifiable as a proposal for which separate alternatives would be required. We also note that Interior's and Reclamation's salinity control program cannot be classified as a proposal, even under a broad reading of Section 102(2)(E).

Because we find that on-farm techniques are integral segments of both programs, and we locate the existence of sufficient record evidence to indicate that significant attention to on-farm measures has been undertaken by the three defendants, we conclude that the district court's entry of judgment on these two claims was proper.[67] Our conclusion is further supported by our awareness that the applicable standard of review only permits a reviewing court to compel agency action unlawfully withheld by an agency's failure to act. APA Section 10(e)(1), 5 U.S.C. § 706(1). Since EDF has been unsuccessful in its effort to establish that either EPA, Interior, or Reclamation have failed to act, we must affirm the decision rendered below.

## X. CONCLUSION

For the foregoing reasons, the order and entry of judgment of the district court are affirmed.

**67.** Accordingly, we make no ruling on whether EPA is exempt from the specific requirements

of NEPA Section 102(2)(E).