**The AMERICAN RADIO RELAY LEAGUE, INC., Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.**

**No. 78–1853.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 12, 1979.

Decided Feb. 22, 1980.

---

Robert M. Booth, Jr., Washington, D. C., with whom Julian P. Freret, Washington, D. C., was on brief, for petitioner.

Gregory M. Christopher, Counsel, F. C. C., Washington, D. C., for respondents.

Robert R. Bruce, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, C. Grey Pash, Jr., Counsel, F. C. C., and Robert B. Nicholson and Michael J. Pugh, Attys., U. S. Dept. of Justice, Washington, D. C., were on the brief, for respondents.

Before BAZELON, Senior Circuit Judge, TAMM, Circuit Judge, and HAROLD H. GREENE,* U.S. District Judge for the District of Columbia.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

In an effort to combat the recurring problem of Citizens Band (CB) radio interference with television reception, the Federal Communications Commission has adopted rules that generally prohibit the manufacture and sale of certain amplifiers that can be used by CB operators. The American Radio Relay League, Inc. (League), a nonprofit association of amateur radio operators, claims that these rules unnecessarily infringe upon the ability of radio amateurs to engage in their pastime, and that the rules are therefore arbitrary, capricious, and unreasonable. We reject the League's argument and uphold the Commission's rules.

* Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

## I. BACKGROUND

In part to overcome the "cacophony of competing voices" using the radio airwaves, Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 376, 89 S.Ct. 1794, 1799, 23 L.Ed.2d 371 (1969), Congress enacted a series of statutes, culminating in the Communications Act of 1934, as amended, 47 U.S.C. §§ 151–609 (1976). As part of the regulatory scheme, Congress created the Federal Communications Commission and gave that agency broad authority to regulate the use of space on the radio spectrum. Congress charged the Commission "to make available, so far as possible, to all the people of the United States a rapid, efficient, Nationwide, and world-wide wire and radio communication service," id. § 151, and to "encourage the larger and more effective use of radio in the public interest," id. § 303(g). The Commission has general authority to carry out this mandate through the promulgation of rules and regulations. Id. §§ 154(i), 303(r). More specifically, it is authorized to issue regulations "to prevent interference between stations," id. § 303(f), and

consistent with the public interest, convenience, and necessity, [to] make reasonable regulations governing the interference potential of devices which in their operation are capable of emitting radio frequency energy by radiation, conduction, or other means in sufficient degree to cause harmful interference to radio communications. Such regulations shall be applicable to the manufacture, import, sale, offer for sale, shipment, or use of such devices.

Id. § 302a(a).

In the exercise of its regulatory authority, the Commission has designated over 20 frequency bands, including the bands from 28 to 29 megahertz (MHz),[1] for use by amateur ("ham") radio operators. See 47 C.F.R. § 97.61(a) (1978). In general, ama-

1. More precisely, this authorized amateur band extends from 28.000 to 29.700 MHz. 47 C.F.R. § 97.61(a) (1978).

teurs may use up to 1000 watts of transmitting power. *See id.* § 97.67. CB operators, on the other hand, may only use a frequency of 27 MHz,[2] *id.* § 95.401 (CB rule 17), and are generally prohibited from using more than 4 watts of power, *id.* (CB rule 20).[3]

The use of CB radios has expanded dramatically in the last ten years. From 1974 through 1978 alone, the number of licensed CB operators grew from fewer than 800,000 to more than 14,000,000. Brief for Respondents at 2 n.1.[4] Unfortunately, however, the increasing interest in this activity has generated an unwelcome byproduct: interference with television reception on certain channels. This interference is primarily caused by CB operators who unlawfully use radio power amplifiers to increase the transmitting power of their CB units far beyond the authorized level of 4 watts. *See Amendment of Parts 2 & 97 of Commission Rules,* 67 F.C.C.2d 939, 940 (1978) [hereinafter cited as *Report & Order Adopting 1978 Rules* ]. The interference problem has grown to the point that, over a year's time, some 3,000,000 to 21,000,000 persons may experience difficulties in television reception. *See id.*

After an earlier limited effort to combat the interference problem, *see Amendment of Part 2 of Commission Rules,* 23 F.C.C.2d 79 (1970), the Commission in 1975 attempted to prohibit not only the use but also the marketing of the offensive amplifying equipment. *See Amendment of Parts 2 & 95 of Commission Rules,* 50 F.C.C.2d 310, *amended,* 53 F.C.C.2d 66 (1975). In particular, the 1975 rules proscribed (1) the use of any external radio frequency power amplifier (external amplifier) [5] with a CB radio and (2) the marketing of any external amplifier capable of use between 24 and 35 MHz, frequencies spanning the 27 MHz CB frequency,[6] unless the amplifier could also be used on four amateur radio bands at specified frequencies. *See id.* Unfortunately, the 1975 Commission action proved ineffective. Manufacturers and suppliers evaded the marketing rule by manufacturing and selling "broad-band linear amplifiers." These amplifiers, because they could be used on the four specified amateur bands, were technically outside the scope of the marketing prohibition. In fact, however, they were manufactured and marketed almost exclusively for use on the 27 MHz CB frequency, and large numbers of CB operators bought these amplifiers for illegal use with their CB units. *See Report & Order Adopting 1978 Rules,* 67 F.C.C.2d at 941.

With the interference problem continuing to grow at an alarming rate, the Commission acted again in 1978, this time adopting the more stringent rules that are before us today. *See Report & Order Adopting 1978 Rules,* 67 F.C.C.2d 939. In general, these rules prohibit the manufacture and marketing of any external amplifier capable of use between 24 and 35 MHz, regardless of whether it can also be used on other frequencies.

---

**2.** More precisely, CB broadcasts may occur on 40 channels between 26.965 and 27.405 MHz. *Id.* § 95.401 (CB rule 17).

**3.** The 1000-watt power limitation for amateurs is based on input power, *id.* § 97.67(a), while the 4-watt limitation for CB operators is based on output power, *id.* § 95.401 (CB rule 20). This distinction, while not insignificant, does not negate the vast difference in permissible power usage.

**4.** In addition to the licensed CB operators, there are probably several million more operators who are unlicensed. *See* Brief for Petitioner at 5 n.12.

**5.** "[A]n external radio frequency power amplifier is any device which, (1) when used in conjunction with a radio transmitter as a signal source is capable of amplification of that signal, and (2) is not an integral part of a radio transmitter as manufactured." *Id.* § 2.815(a). *Accord, id.* § 97.3(y).

**6.** The Commission's goal was only to prevent the use of amplifiers on the 27 MHz CB band. Due to the technical inability to "fine tune" an amplifier's frequency capabilities, however, a rule covering a broader frequency spectrum was required to ensure that use at 27 MHz would not be possible. *See* Amendment of Parts 2 & 95 of Commission Rules, 50 F.C.C.2d 310, 311 (1975).

## II. STANDARD OF REVIEW

The administrative action we review[7] in this case is "notice-and-comment" rulemaking, conducted pursuant to section 553 of the Administrative Procedure Act, 5 U.S.C. § 553 (1976).[8] Our review of such rulemaking is generally quite limited. Under section 706(2)(A) of the Act, our only role is to decide whether an agency's rulemaking was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A). As this court noted in *Ethyl Corp. v. EPA*, 176 U.S.App. D.C. 373, 541 F.2d 1 (D.C. Cir.) (en banc), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976), "This standard of review is a highly deferential one. It presumes agency action to be valid. Moreover, it forbids the court's substituting its judgment for that of the agency, and requires affirmance if a rational basis exists for the agency's decision." *Id.* at 406, 541 F.2d at 34 (citations omitted). Thus, although we are not obliged to "rubber-stamp the agency decision," *id.*, our task ends when we find that the agency has engaged in reasoned decisionmaking within the scope of its congressional mandate.

The League, while not disputing the general applicability of this deferential standard for reviewing agency rules, contends that the present case demands a more exacting scrutiny. The League points to the language of 47 U.S.C. § 302a(a) (1976), which authorizes the Commission to make "*reasonable* regulations governing the interference potential of [radio] devices." *Id.* (emphasis added). The League argues that the statute's express requirement of reasonableness demands something more than would otherwise be required of an agency adopting rules and that our standard of review should be correspondingly more searching.

We fail to find significance in the fact that Congress said "reasonable regulations" instead of simply "regulations." To be sure, it is a recognized principle that "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant· . . . ." 2A *Sutherland Statutory Construction* § 46.06, at 63 (4th ed. C. Sands 1973). Nonetheless, courts will not give independent meaning to a word "where it is apparent from the context of the act that the word is surplusage." *Id.* § 47.37, at 167 (footnote omitted).[9] Here, the word "reasonable" clearly is nothing more than surplusage, for we cannot assume that Congress would ever intend anything other than *reasonable* agency action. Indeed, the very nature of our review under the typical "arbitrary and capricious" standard demands that we determine whether the agency has acted within the bounds of reason. As Professor Davis has stated, "A legislative rule is valid and is as binding upon a court as a statute if it is (a) within the granted power, (b) issued pursuant to proper procedure, and (c) reasonable. The requirement of reasonableness stems . . . from the idea of statutory interpretation that legislative bodies are assumed to intend to avoid the delegation of power to act unreasonably." 1 K. Davis, *Administrative Law Treatise* § 5.03, at 299 (1958). Whether we say a rule must be "reasonable," must have a "rational basis," or must not be "arbitrary or capricious," our standard for reviewing the rule is the same: we must defer to the agency rulemakers unless the challenger shows that the agency has abused the broad policymaking discretion granted it by Congress and thereby acted beyond the scope of its rulemaking authority.

---

7. Our jurisdiction rests on 28 U.S.C. § 2342(1) (1976). *See also* 47 *id.* § 402.

8. Although the League contends that the Commission did not comply with the procedural requisites of § 553, we do not consider these arguments, for the League did not raise its contentions before the Commission. *See* 47 U.S.C. § 405 (1976); *Hansen v. FCC*, 134 U.S.

App.D.C. 100, 102, 413 F.2d 374, 376 (D.C. Cir. 1969).

9. In the end, "[t]he intention prevails over the letter, and the letter must if possible be read so as to conform to the spirit of the act." 2A *Sutherland Statutory Construction* § 46.07, at 65 (4th ed. C. Sands 1973).

## III. ANALYSIS

One of the two rules being challenged requires type acceptance [10] as a precondition to the manufacture, importation, or marketing of any external amplifier capable of operation below 144 MHz. *See* 47 C.F.R. § 2.815(c) (1978).[11] To be approved, an amplifier (1) must have a minimum input driving power of 50 watts, *see id.* § 97.77(b)(3), which is far in excess of the 4 watts available from CB transmitters, and (2) must not have the automatic sensing circuitry, necessary to CB operations, that electronically connects the antenna directly to the receiver when the unit is receiving and to the output of the amplifier when the unit is transmitting, *see id.* § 97.77(d)(5). If the Commission had stopped here, the League would not be in court today, for it does not object to the type-acceptance requirements relating to minimum input power and automatic sensing circuitry. To the chagrin of the League, however, the type-acceptance rule goes on to preclude the approval of any amplifier, regardless of input power or sensing circuitry, that is capable of operation between 24 and 35 MHz, *see id.* § 97.77(c), and the Commission's second rule directly bans the manufacture, importation, or marketing of any amplifier capable of operation between these frequencies, *see id.* § 2.815(b).[12]

The rules are subject to some exceptions, several of which concern amateur operators. In its report and order adopting the rules, the Commission itself described a number of the exceptions of interest to amateurs:

> [The rules] will still allow the amateur operator to construct his own equipment; to modify his equipment, equipment from any other radio service or the equipment of another amateur operator; to service the equipment of another licensed amateur operator; and to construct one unit of a particular model amplifier per calendar year without obtaining grant of type acceptance provided, in all cases, that the amplifier meets the applicable technical requirements after any of the above changes and the amplifier is for use only at a licensed amateur radio station.

*Report & Order Adopting 1978 Rules,* 67 F.C.C.2d at 947. *See* 47 C.F.R. §§ 2.815(d)–(e), 2.1001(f), 97.75, 97.76(a)(2)–(5), (b) (1978).

The League contends that the Commission could have devised rules equally effectual in combating CB interference without treading so heavily on amateur operators, who concededly are not responsible for the interference problem.[13] In particular, the League claims that the type-acceptance requirements setting a minimum input power and banning automatic sensing circuitry are adequate to prevent the undesired interference and that the further type-acceptance provisions and the direct ban relating to amplifiers capable of use between 24 and 35 MHz are nothing more than senseless administrative overkill. According to the League, no amplifier complying with the standards governing minimum input power and automatic sensing circuitry could be used with a CB, and thus none could contribute to the CB interference problem. Moreover, the League points out that amateur operators make extensive use of the band between 28.0 and 29.7 MHz,[14] which

---

**10.** "Type acceptance is an equipment authorization issued by the Commission for equipment to be used pursuant to a station authorization. Type acceptance is based on representations and test data submitted by the applicant." 47 C.F.R. § 2.905(a) (1978).

**11.** The type-acceptance requirements are in effect for a three-year period ending April 28, 1981. *Id.* § 2.815(c).

**12.** *See also* note 6 *supra.*

**13.** Commissioner White, concurring in part and dissenting in part to the adoption of the rules that are before us, stated that amateurs "are not the cause of the problem. In fact, amateurs have assisted the Commission in its enforcement problems both in policing their own ranks and in uncovering the illegal use of CB since the latter can be disruptive of their own service." *Report & Order Adopting 1978 Rules,* 67 F.C.C.2d at 954 (White, Comm'r, concurring in part and dissenting in part).

**14.** This frequency band has been allocated to amateur operators on a worldwide basis by the radio regulations of the International Telecommunication Union. *See* Brief for Petitioner at 29.

falls within the frequencies designated in the rule. Thus, from the League's perspective, this additional rulemaking is not only unnecessary but also extremely harmful to the interests of innocent amateurs.

Had we been the rulemakers in this case, we might have been more hesitant in encroaching on the domain of the innocent amateur operators. Nonetheless, we cannot say that the agency abused its discretion in adopting the rules that it did. We cannot impute to Congress an intent that the Commission move only by an alternative that is the "least restrictive" concerning the interests of amateurs,[15] nor can we conclude that the agency's decision was in any sense "arbitrary," "capricious," "irrational," or "unreasonable."

The Commission, in dealing with the serious and increasing problem of interference, decided to adopt stringent rules, rules that do adversely affect the interests of amateurs. The agency did weigh the interests of amateur operators, however, and it created a number of exceptions for their benefit. *See* pp. —— –—— of —— U.S.App.D.C., pp. 880–881 of 617 F.2d *supra*. Moreover, the rules do not affect amateur operations on broad ranges of spectrum space that are outside the frequencies covered by the rules. *See* 47 C.F.R. § 97.61(a) (1978).

On the other side of the Commission's balance, of course, were the important interests of the television-viewing public, which has suffered significantly from the interference. The agency realized that "[p]revious attempts by the Commission to deal with [the interference] problem and at the same time provide for non-restrictive amateur operations . . . [had] proved unsuccessful." *Amendment of Parts 2 & 97*

of Commission Rules, Docket Nos. 21116 & 21117, at 5 (FCC July 28, 1978) (memorandum opinion & order on requests for reconsideration), *reprinted in* Joint Appendix at 122, 126. Through the present rules, the Commission desired to send "a clear and definite signal . . . to manufacturers of the offensive equipment that the Commission is determined to act in the public interest to eliminate the source of a problem of enormous dimensions and impact on the American consumer." *Id.* Furthermore, the agency concluded that the "unequivocal prohibition of the manufacture and marketing of [the] offensive equipment" would significantly enhance the enforceability of the rules. *Id.*

## IV. CONCLUSION

The Commission has broad discretion in making policy determinations through the enactment of rules. In the present case, it arguably could have drawn its rules more narrowly without detracting from their effectiveness. This is not, however, a matter that this court can redress in reviewing an agency's rules. The Commission gave due consideration to the interests of amateurs and exercised its policy discretion in a manner that reasonably addressed the problem with which it was confronted. We cannot require an agency to do more.

*Affirmed.*

---

15. The law *recognizes a constitutional doctrine* requiring, in certain circumstances, that the government "not employ a specific means to accomplish an admittedly legitimate purpose if it has available alternative means that are less restrictive upon some individual interest."

Note, *The Less Restrictive Alternative in Constitutional Adjudication: An Analysis, A Justification, and Some Criteria*, 27 Vand.L.Rev. 971, 972 (1974). There is not, however, an analogous statutory requirement for agency rulemaking.