**LOYOLA UNIVERSITY, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

National Black Media Coalition, Association for Broadcast Engineering Standards, Inc., WSM, Inc., and Clear Channel Broadcasting Service, Intervenors.

**CAPITAL CITIES COMMUNICATIONS, INC., Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

American Broadcasting Companies, Inc., WSM, Inc., and Clear Channel Broadcasting Service, Intervenors.

**Nos. 80–1824, 80–2018.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 7, 1981.

Decided Jan. 26, 1982.

---

Joel Rosenbloom, Washington, D. C., with whom Jane Tucker Dana, Robert A. Marmet and Harold K. McCombs, Jr., Washington, D. C., were on joint brief, for petitioners.

Gregory M. Christopher, Counsel, F. C. C., Washington, D. C., with whom Marjorie S. Reed, Acting Gen. Counsel, F. C. C., and Robert B. Nicholson and Nancy C. Garrison, Attys., Dept. of Justice, Washington, D. C., were on brief, for respondents. Daniel J. Conway, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for respondent United States of America.

R. Russell Egan and David E. Hilliard, Washington, D. C., were on brief for intervenor WSM, Inc., in Nos. 80–1824 and 80–2018.

Nolan A. Bowie, Washington, D. C., and Jeffrey H. Olson, were on brief for intervenor Nat. Black Media Coalition in No. 80–1824.

James A. McKenna, Jr., Thomas N. Frohock and R. Michael Senkowski, Washington, D. C., entered appearances for intervenor American Broadcasting Co., Inc., in No. 80–2018.

David E. Hilliard, Washington, D. C., also entered an appearance for intervenor Clear Channel Broadcasting Service in Nos. 80–1824 and 80–2018.

William J. Potts, Jr., and John M. Pelkey, Washington, D. C., entered appearances for intervenor Ass'n for Broadcast Engineering Standards, Inc., in No. 80–1824.

Before TAMM, MacKINNON and EDWARDS, Circuit Judges.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

In this case, petitioners, licensees of Class I–A clear channel AM radio stations, seek review of a Federal Communications Commission (Commission) frequency allocations rulemaking proceeding.[1] Neither the legal claims nor the policy issues that give rise to this controversy are novel. Petitioners contend that the Commission departed from precedent without adequate explanation and violated its statutory mandate. The optimum use of clear channel frequencies has been the subject of heated debate for decades. In the challenged proceeding, the Commission rejected proposals that it authorize increased power for clear channel stations and instead chose to permit limited sharing of clear channel frequencies. We hold that, in balancing competing demands for a scarce radio spectrum, the Commission engaged in reasoned decisionmaking within the scope of its statutory mandate. Accordingly, we affirm.

## I. BACKGROUND

Section 307(b) of the Communications Act of 1934, as amended (the Act), requires the Commission "to provide a fair, efficient, and equitable distribution" of radio service "among the several States and communities." 47 U.S.C. § 307(b) (1976).[2] Since 1927, the Commission and its predecessor agency, the Federal Radio Commission, have pursued three basic goals in allocating use of the radio spectrum: (1) provision of at least one service to all persons; (2) provi-

---

1. Jurisdiction lies in this court pursuant to 28 U.S.C. § 2342(1) (1976) and 47 U.S.C. § 402(a) (1976).

2. *See also* section 1 of the Communications Act of 1934, which directs the Commission "to

make available, so far as possible, to all the people of the United States a rapid, efficient, Nationwide ... radio communication service ...." 47 U.S.C. § 151 (1976).

sion of service to as many persons from as many diversified sources as possible; and (3) provision of outlets for local self-expression addressed to each community's needs and interests. *In Re Clear Channel Broadcasting in the AM Broadcast Band*, 78 F.C.C.2d 1345, 1349 (1980) [*Final Report*]. Clear channel stations were created as one means of achieving the goal of providing all persons with at least one service. Class I–A clear channel stations are high-power stations whose skywave signal is given maximum protection in order to provide secondary service at night to areas of the country—so-called "white areas"—not receiving primary nighttime service from any other station.[3] Originally, all Class I–A clear channel licensees enjoyed exclusive nighttime use of their frequencies. Exclusivity was necessary because some twenty-five million people had no primary service at night and depended upon the skywave service provided by distant clear channel stations.[4] As years passed and demand for additional stations grew, however, exclusivity became less and less practicable, and proposals to make Class I–A clear channels available for multiple assignments were urged upon the Commission. *See Final Report*, 78 F.C.C.2d at 1353.

In 1945, the Commission instituted a rulemaking proceeding—Docket 6741—to consider conflicting views concerning the most efficient use of clear channel frequencies. One view was that service to "white areas" could be improved by authorizing operation of clear channel stations at power in excess of the existing 50 kW limit, thereby increasing their range and reliability. *See In Re Clear Channel Broadcasting in the AM Broadcast Band*, 70 F.C.C.2d 1077, 1081 (1979) [*Further Notice*]. Proponents of this position also urged retention of exclusivity to prevent interference. *Id.* Conflicting proposals suggested that a first nighttime primary service be provided to as many areas as possible by authorizing additional stations to operate on frequencies previously reserved for clear channel stations. *Id.* In 1961, after more than fifteen years of debate and study, the Commission adopted a report and order amending its rules to authorize additional full-time stations on thirteen of the twenty-five Class I–A clear channels. *Clear Channel Broadcasting in the Standard Broadcast Band*, 31 F.C.C. 565 (1961). The Commission deferred decision on removal of the 50 kW power ceiling and possible assignment of still more stations to all Class I–A clear channels. *Id.*

On petition for review of the 1961 order, the central contention was that, in failing to authorize higher power, the Commission had acted in derogation of its obligations under section 307(b). *Goodwill Stations, Inc. v. FCC*, 325 F.2d 637, 642 (D.C.Cir. 1963). The petitioners also challenged, on the same basis, the decision to permit limited duplication on clear channel frequencies. *Id.* at 643. Petitioners in the instant litigation raise similar issues. *See* p. 1225 *infra*. We rejected petitioners' arguments in *Goodwill Stations* and affirmed the Commission's decision on the grounds that the competing factors were properly considered and a rational and reasonable result was reached. *Id.* at 642–43.

3. At the risk of oversimplifying complex concepts, we note that stations operating on standard broadcast (AM) frequencies simultaneously transmit two types of signals, a groundwave signal and a skywave signal. Groundwave signals move horizontally along the earth's surface and are quite dependable. Skywave signals are most effective at night, when reflection from the ionosphere carries them many hundreds of miles from the transmitter. Skywave service is less reliable than groundwave service because the intensity of the skywave signal varies with factors such as time of day and year, sunspot activity, and weather. Thus, the Commission classifies the service provided by groundwave signals as "primary" and that provided by skywave signals as "secondary." *See generally* In Re Clear Channel Broadcasting in the AM Broadcast Band, 78 F.C.C.2d 1345, 1349–53 [*Final Report*].

4. For a skywave signal to be effective, it must be protected from interference by other stations on the same frequency, for if a skywave lands in an area already receiving service from another station on the same frequency, the two signals may cancel one another. Thus, assignment of additional stations to clear channel frequencies, known as "duplication," significantly reduces the reach and reliability of skywave service. *Id.*

## II. THE PRESENT PROCEEDING

In December 1975 the Commission reopened the clear channel proceeding to seek final resolution of the issues reserved in the earlier rulemaking. *Clear Channel Broadcasting*, 40 Fed.Reg. 58467 (1975). Specifically, the Commission requested comments on proposals to increase authorized power for selected Class I–A stations and proposals to permit assignment of additional stations to Class I–A channels. *Id.* Interested parties filed voluminous comments and conducted extensive studies in response to the initial rulemaking notice, and in January 1979 the Commission issued the *Further Notice.* There, the Commission announced its intention to retain the 50 kW power maximum for Class I–A stations and to authorize additional duplication on Class I–A frequencies. *Further Notice*, 70 F.C.C.2d 1077.

On June 20, 1980, after reviewing still more studies and comments, the Commission released the *Final Report*, which is under review here. The *Final Report* announced the Commission's final decision to open the way for more than 100 additional AM radio stations by allowing shared use of the Class I–A clear channel frequencies and to maintain the 50 kW limit on Class I–A transmitter power. 78 F.C.C.2d 1345.

Both the *Further Notice* and the *Final Report* detailed the reasons underlying the Commission's decision. A major factor contributing to the decision was that growth of FM service since the 1961 rulemaking had made the need for secondary service less pressing.[5] *Further Notice*, 70 F.C.C.2d at 1079, 1087; *Final Report*, 78 F.C.C.2d at 1354–55. In addition, the Commission

found that studies revealed that the increasingly localized character of radio programming had resulted in relative listener disinterest in very distant clear channel stations. An overwhelming majority of listeners live within 750 miles of at least one station, an area protected from interference under the revised clear channel rules.[6] *Further Notice*, 70 F.C.C.2d at 1094–97; *Final Report*, 78 F.C.C.2d at 1365, 1367. The Commission concluded that beyond the 700 to 750 mile range, the signals of clear channels broadcasting at 50 kW are generally too weak or intermittent to justify protection at the expense of precluding use of the frequencies for much-needed new stations. *Final Report*, 78 F.C.C.2d at 1365.

Finally, the Commission observed that in response to the *Further Notice* only seven of the twenty-five Class I–A stations reiterated the intention, previously expressed by eleven of them, to use power exceeding 50 kW if authorized to do so. *Id.* at 1360. The Commission did not believe that any of these stations reliably projected the number of persons who would gain a first nighttime primary service as a result of increased power. *Id.* at 1360–61.

Although it recognized the value of the wide-area service provided by the Class I–A clear channels, *id.* at 1361–62, the Commission noted that such use of the spectrum hindered the agency's ability to provide outlets for self-expression to as many communities as possible. *Id.* at 1349. Based on an analysis of all the data, the Commission believed that the public interest in providing many areas with a first or second local or primary service,[7] and in expanding non-

5. The Commission found that only about four million people residing in the forty-eight contiguous states—about two percent of the population—are without primary nighttime service today, and virtually all areas that lack such service receive *at least* one secondary service. Clear Channel Broadcasting in the AM Broadcast Band, 70 F.C.C.2d 1077, 1089 (1979) [*Further Notice*]; *Final Report*, 78 F.C.C.2d at 1354, 1356.

6. The secondary service of existing Class I–A stations will continue to be protected from interference within their 0.5 mV/m 50% sky-

wave contours. Such a contour normally extends to approximately 750 miles from the transmitter. *Final Report*, 78 F.C.C.2d at 1367.

7. The Commission observed that there are over 2,000 daytime-only AM stations, and more than 300 of them are located in non-suburban communities where there is no unlimited time local AM station, locally assigned FM station, or available FM channel. *Final Report*, 78 F.C.C.2d at 1359. In addition, the Commission recognized the need to "reduce the number of places now provided with only one nighttime service from a locally assigned station." *Id.*

commercial services [8] and minority ownership [9] outweighed the public interest in higher power. *See Final Report*, 78 F.C.C.2d at 1364.

## III. DISCUSSION

Petitioners argue that the Commission's decision abandons, without justification, a policy mandated by the Federal Communications Act and followed by the Commission and its predecessor agency for more than fifty years—that the needs of unserved or underserved areas are entitled to the highest priority in frequency allocations decisions. Brief for Petitioners at 13, 17–21. Petitioners also contend that the Commission arbitrarily minimized the significance of the service that higher power could provide, *id.* at 21–29, and that it failed to explain why the need for local, minority, and noncommercial stations should be given precedence over the needs of audiences who presently receive inadequate service or no service at all. *Id.* at 30–34. Petitioners also charge that the Commission arbitrarily failed to consider a proposal that higher power for selected Class I–A stations be combined with duplication. *Id.* at 34–36. Finally, it is argued that the Commission erred in partially relying upon a projected international agreement as independent support for its decision. *Id.* at 37–39.

As this court has noted before, our review of this type of rulemaking is quite limited. *American Radio Relay League, Inc. v. FCC*, 617 F.2d 875, 879 (D.C.Cir. 1980). Our sole task is to determine whether the Commission's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1976). This standard of review is a highly deferential one that presumes the validity of agency action. *American Radio Relay League*, 617 F.2d at 879, *quoting Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C.Cir.) (en banc), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976). This court is not free to substitute its judg-

ment for that of the Commission, and we must affirm the Commission's decision if it is founded upon a rational basis. *Id.*

We cannot find in this case that the Commission acted in an arbitrary or capricious fashion. The issues underlying the clear channel controversy have been thoroughly debated before, and studied by, the Commission in proceedings cumulatively spanning more than two decades. All interested parties have had the opportunity to express their views and, as noted above, the Commission has provided detailed reasons for the choices it ultimately made.

Neither can we find that the Commission's decision violates section 307(b). All that section requires is that the Commission act to ensure a fair, efficient, and equitable distribution of radio service throughout the country. We believe that is precisely what the Commission accomplished here. Section 303(g) of the Act directs the Commission to "[s]tudy new uses for radio, provide for experimental uses of frequencies, and generally encourage the larger and more effective use of radio *in the public interest.*" 47 U.S.C. § 303(g) (1976) (emphasis added). In the challenged proceeding, the Commission found that, in light of changing listener values, the growth of FM radio service, and other factors, the public interest would be better served by allowing additional sharing of clear channel frequencies than by adopting petitioners' proposals for higher power and exclusivity. We hold that this is precisely the sort of determination Congress intended, through sections 307(b) and 303(g), to leave to the broad discretion of the Commission. It is not the function of this court to determine what is in the public interest. *American Broadcasting-Paramount Theatres, Inc. v. FCC*, 345 F.2d 954, 960 (D.C.Cir.1965), *cert. denied sub nom. United States v. Broadcasting-Paramount Theatres, Inc.*, 383 U.S. 906, 86 S.Ct. 880, 15 L.Ed.2d 662 (1966).

Petitioners' complaint that the Commission failed to consider their proposed

---

8. *Id.* at 1359.

9. The Commission noted that of over 8,000 FM and AM radio stations, fewer than 200 are minority-owned, and that all three branches of government have recognized the importance of fostering minority participation in ownership and operation of broadcast stations. *Id.* at 1368; *Further Notice*, 70 F.C.C.2d at 1105–06.

alternative course of action, *i.e.*, combining higher power for selected clear channel stations with duplication, is also without merit. The Commission is not required to discuss explicitly each proposal it receives,[10] so long as it has taken a "hard look" at salient problems and engaged in reasoned decision-making. *See Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C.Cir. 1970), *cert. denied*, 403 U.S. 923, 92 S.Ct. 2233, 29 L.Ed.2d 701 (1971). The fact that there are other solutions to a problem is irrelevant provided that the option selected is not irrational. *American Radio Relay League*, 617 F.2d at 881 & n.15.

Finally, we find no infirmity in the Commission's reference to a preliminary international agreement. The Commission did not rely on this agreement as a basis for its decision in the sense petitioners contend. Rather, the Commission merely noted that international complications could result from unilateral authorization of nighttime power in excess of 50 kW. *See Final Report*, 78 F.C.C.2d at 1365.

### IV. CONCLUSION

It is not for this court to pass on the wisdom of the scheme adopted by the Commission. Rather, our responsibility is to ensure that the agency has complied with statutory mandates and reached a reasonable decision supported by the record. In this case, the Commission's conclusions are amply explained and supported by its findings of fact. We cannot conclude that the Commission abused its discretion by reaching a result petitioners find disagreeable, nor can we conclude that the Commission acted in an arbitrary or capricious manner. We therefore affirm the decision of the Commission in all respects.

*It is so ordered.*

---

**10.** Although the Commission did not explicitly discuss petitioners' proposal for combining higher power and duplication, it did acknowl-edge receiving it. *Final Report*, 78 F.C.C.2d at 1360 n.*.