ACTION FOR CHILDREN'S TELEVISION, et al., Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and the United States of America, Respondents,

Cox Communications, Inc., Capital Cities/ABC, Inc., CBS, Inc., Tribune Broadcasting Co., The Association of Independent Television Stations, Inc., National Association of Broadcasters, John W. DeTar, National Broadcasting Company, Inc., Intervenors.

No. 86–1425.

United States Court of Appeals, District of Columbia Circuit.

Argued March 30, 1987.

Decided June 26, 1987.

---

Daniel Warshawsky and Henry Geller, Washington, D.C., with whom Douglas K. Parker and Donna Lampert were on the brief, for petitioners.

C. Grey Pash, Jr., Counsel, F.C.C., Washington, D.C., with whom Diane S. Killory, General Counsel, Daniel M. Armstrong, Associate General Counsel, F.C.C., Catherine G. O'Sullivan and Donald S. Clark, Attys., Dept. of Justice were on the brief, for respondents.

Timothy B. Dyk, Washington, D.C., with whom Philip D. Anker, Steven A. Schneider, Henry L. Baumann, Barry D. Umansky and J. Laurent Scharff were on the brief for intervenors, CBS, Inc., et al.

Werner K. Hartenberger, Washington, D.C., entered an appearance for intervenor, Cox Communications, Inc.

J. Roger Wollenberg and Joel Rosenbloom, Washington D.C., entered appearances for intervenor, Capital Cities/ABC, Inc.

Robert A. Beizer, Washington, D.C., entered an appearance for intervenor, Tribune Broadcasting Co.

David G. Rozzelle and Kathryn Riley Dole, Washington, D.C., entered appearances for intervenor, John W. DeTar.

Before EDWARDS and STARR, Circuit Judges, and SWYGERT,* Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge STARR.

* Of the United States Court of Appeals for the Seventh Circuit, sitting by designation pursuant to 28 U.S.C. § 294(d).

STARR, Circuit Judge:

This case brings before us two issues pertaining to the Federal Communications Commission's regulation of television broadcasting. Petitioners Action for Children's Television and Black Citizens for a Fair Media ("ACT" or "petitioners") allege, first, that the Commission failed to engage in "reasoned decisionmaking" in withdrawing its long-standing children's television commercialization guidelines. Second, petitioners argue that the Commission failed adequately to justify its replacement of comprehensive television program logging requirements with a less exacting requirement of quarterly lists of significant "issue-oriented" programming.

We conclude that the Commission has failed sufficiently to justify its action deregulating children's television, but that it has substantially supported the revision of television programming log requirements. Consequently, we remand the case to the Commission for further explanation of its elimination of the children's television commercialization guidelines, but uphold its decision to alter program logkeeping procedures.

## I

### A

The special needs of children in television's vast audience have engaged the FCC's attention for over 15 years. Since 1971, the Commission has striven to ensure that children's television programming and commercialization reflect the "high public interest considerations involved in the use of television, perhaps the most powerful communications medium ever devised, in relation to a large and important segment of the audience, the nation's children." *See Notice of Inquiry and Notice of Proposed Rule Making*, 28 F.C.C.2d 368, 369–70

(1971). The Commission published an exhaustive report in 1974, concluding that because of their youth and inexperience children are "far more trusting of and vulnerable to commercial 'pitches' than are adults" and that "very young children cannot distinguish conceptually between programming and advertising." *Children's Television Report and Policy Statement*, 50 F.C.C.2d 1, 11 (1974) (*"1974 Report"*). To prevent advertisers from taking advantage of children's lack of commercial savvy, the Commission adopted (1) specific guidelines on the permissible level of commercialization in children's programming and (2) strict requirements that broadcasters maintain adequate separation between program content and commercial messages. *Id.* at 15–16.[1] In establishing both requirements, the Commission explicitly mentioned and relied upon the National Association of Broadcasters' ("NAB") self-imposed commercialization guidelines as a benchmark for regulatory action. *Id.* at 12, 14.

The FCC's special treatment of children's television did not end, however, with its extensive 1974 Report. Until recently, the Commission evinced a consistent interest in updating, reevaluating, and modifying its children's television guidelines. In 1975, for example, the FCC established a somewhat more stringent children's television examination procedure for station license renewal proceedings. *Memorandum Opinion & Order*, 53 F.C.C.2d 161 (1975). In 1978, it reevaluated and reaffirmed its commitment to specific advertising guidelines for children's television. *Second Notice of Inquiry*, 68 F.C.C.2d 1344 (1978). In 1979, the Commission staff undertook an extensive review of the policy, concluding that no changes were in order, *Children's Television Task Force Report,*

---

1. Throughout its examination of children's television, the Commission has been sensitive to the limits imposed by the First Amendment on its regulatory efforts. *See* 1974 Report, 50 F.C.C.2d at 3, *citing Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969); 96 F.C.C.2d 634, 652 (1984). *Cf. Telecommunications Research & Action Center v. FCC,* 801 F.2d 501, 517–18 (1986) (rejecting notion that FCC's "fairness doctrine" is required by statute). Early on in its efforts with respect to children's television, the Commission carefully emphasized that "[a]lthough the unique nature of the broadcasting medium may justify some differences in the First Amendment standard applied to it, it is clear that any regulation of programming must be reconciled with free speech considerations." 50 F.C.C.2d at 3.

Docket 19142 (1979), a suggestion the Commission accepted. *Notice of Proposed Rulemaking,* 75 F.C.C.2d 138 (1979). As late as 1984, the Commission emphasized (albeit in reference to programming rather than commercialization) licensees' "continuing duty ... to examine the program needs of the child part of the audience." *Children's Television Programming and Advertising Practices,* 96 F.C.C.2d 634, 656 (1984), *aff'd sub nom. ACT v. FCC,* 756 F.2d 899 (D.C.Cir.1985).

In 1983, the Commission embarked upon a general program of deregulating the commercial and programming content of television. *See Notice of Proposed Rulemaking,* 94 F.C.C.2d 678 (August 4, 1983). After notice-and-comment proceedings, the Commission eliminated all quantitative commercial guidelines for television broadcasting. *Revision of Programming and Commercialization Policies, Ascertainment Requirements, and Program Log Requirements for Commercial Television Stations,* 98 F.C.C.2d 1076 (August 21, 1984) ("*1984 Report*"). The Commission found that "commercial levels will be effectively regulated by marketplace forces ... [and that] if stations exceed the tolerance level of viewers ... the market will regulate itself...." *1984 Report,* 98 F.C.C.2d at 1105. The Commission reached this overall conclusion notwithstanding ACT's evidence, presented in the notice-and-comment proceedings, that market forces do not effectually regulate the commercial content of children's television. Indeed, the Commission's 1984 Report failed to address that evidence or, for that matter, even to mention the children's television commercialization policy.

This odd silence unsettled the friends and disturbed the foes of the Commission's deregulation policy. ACT immediately petitioned for reconsideration of the 1984 Report. NAB, in its filing *supporting* the Commission and *opposing* ACT's petition, requested the FCC to take an explicit stand with respect to the children's television commercialization guidelines.

Although ultimately rejecting ACT's petition for rehearing, the Commission did accept the invitation to modify the 1984 Report. *See Memorandum Opinion and Order on Reconsideration of the Report,* 104 F.C.C.2d 358, 372 (May 28, 1986) ("*Revision*"). Responding to NAB's call for clarification, the FCC indicated that the children's television commercialization guidelines had indeed been eliminated by the 1984 Report. The Commission set forth the following explanation:

> Elimination of the policy is consistent with [the] Commission's general de-emphasis regarding quantitative guidelines engendered in the *Report and Order.* Moreover, the Commission has consistently noted the importance of advertising as a support mechanism for the presentation of children's programming.

*Revision,* 104 F.C.C.2d at 370–71 (footnote omitted). These two sentences, along with portions of two modest footnotes, constitute the entirety of the FCC's explanation of its elimination of children's television commercialization guidelines.

ACT assails this shift as arbitrary and capricious. As ACT sees it, the FCC's explanation is entirely mute with respect to the "market-failure" arguments that supported the children's commercialization guidelines in the first place. Inasmuch as the Commission has not examined such pivotal questions, ACT contends, the FCC has failed to provide a "reasoned basis" for its decision.

### B

The second issue moves us beyond children's television to a broader focus on television regulation generally. The 1984 Report significantly relaxed recordkeeping requirements applicable to television station programming. Previously, as a corollary to the FCC's extensive pre–1984 quantitative programming guidelines, the Commission had required television stations to maintain comprehensive logs of all programming. With the elimination of quantitative guidelines,[2] however, the Commission reasoned that "the [comprehensive]

---

**2.** The elimination of these guidelines is not at issue in this case.

logging requirements no longer serve[] any regulatory purpose." 98 F.C.C.2d at 1108–09.

Nevertheless, the FCC did not eliminate entirely television program logging requirements. Rather, it opted to apply the program logging policy adopted in the FCC's general deregulation of radio broadcasting to the deregulation of television broadcasting. *Id.* at 1109. Under this policy, the Commission required television stations to maintain quarterly issues/programs lists containing "in narrative form, a brief description of at least five to ten issues to which the licensee gave particular attention...." *Id.* at 1108. In its revision order, the Commission augmented this logkeeping guideline with the requirement that stations maintain quarterly lists of programs that "have provided the *most significant* treatment of community issues." *Revision,* 104 F.C.C.2d at 371–72 (emphasis added).[3] ACT challenges these relaxed program log requirements as insufficient to provide information necessary to make license renewal proceedings an effective regulatory technique; in addition, ACT argues that the FCC's treatment of program logging failed adequately to consider the special informational needs of challengers in comparative license renewal hearings.

We consider the children's television and program log challenges in turn.

## II

■ It is axiomatic that an agency choosing to alter its regulatory course "must supply a reasoned analysis indicating that its prior policies and standards are being deliberately changed, not casually ignored." *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971); *accord Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 43,

103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). If an agency does not supply a reasoned basis for its action, the courts are not to supply one. *See State Farm,* 463 U.S. at 43, 103 S.Ct. at 2866; *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). Under basic principles of separation of powers, buttressed in no small measure by common sense, we are not to do the agency's work for it.

■ Our review of the FCC's actions in this case fails to unearth a "reasoned basis" adequate to justify the FCC's termination of the children's commercialization guidelines. As we alluded to previously, the Commission grounded its general deregulation of television commercialization on the determination that market forces alone could adequately police the commercial content of television. *1984 Report,* 98 F.C.C.2d at 1105. Petitioners do not challenge this overall decision, and we can discern no reason to question its validity. It is only when the Commission applied that broad policy judgment to the special realm of children's television that complications arise.

Despite ACT's specific comments on the subject during the 1984 rulemaking, the FCC appears at first to have overlooked entirely the existence of the children's guidelines. Only when NAB specifically requested clarification as to the 1984 Report's scope did the Commission come forward and indicate that the general deregulation of television commercialization extended to children's television as well. *Revision,* 104 F.C.C.2d at 370. Even in response to that call for clarification, the Commission deigned to fashion only two sentences (and two moderately pertinent footnotes), explaining in the most cursory fashion that deregulation of children's television commercialization was "consistent with the general deemphasis of qualitative guidelines" and that commercials help support children's programming. *Id.*

---

3. This court had specifically noted the desirability of this additional requirement in the radio deregulation area. *Office of Communication of United Church of Christ v. FCC,* 779 F.2d 702, 713–14 (D.C.Cir.1985) (*"UCC IV"*). The FCC included it as part of the television logkeeping requirements in order to keep those requirements in step with the court's pronouncements on broadcasting logkeeping in general.

Far be it from us to demand long-winded, tiresome explanations. But the Commission's barebones incantation of two abbreviated rationales cannot do service as the requisite "reasoned basis" for altering its long-established policy. For almost 15 years, the FCC's regulation of children's television was founded on the premise that the television marketplace *does not* function adequately when children make up the audience. *See 1974 Report,* 50 F.C.C.2d at 11 ("If our policy against overcommercialization is an important one . . . it is particularly important in programs designed for children."). The Commission has offered neither facts nor analysis to the effect that its earlier concerns over market failure were overemphasized, misguided, outdated or just downright incorrect.[4] Instead, without explanation the Commission has suddenly embraced what had theretofore been an unthinkable bureaucratic conclusion that the market did in fact operate to restrain the commercial content of children's television.

To make bad matters worse, this latter-day inspiration is barely articulated, much less explained; the Commission's rather economical language tells us only that eliminating the children's quantitative guidelines is "consistent with" elimination of guidelines generally. True, but insufficient. Consistently with a broad policy does not tell us why that broad policy obtains in what had uniformly been viewed by the Commission as the unique setting of children glued to the TV screen. In view of the importance of the Commission's *volte face,* we have not the slightest hesitation in concluding that this explanation crosses the line from "the tolerably terse to the intolerably mute." *Greater Boston,* 444 F.2d at 851–52.[5]

Similarly, the Commission's assertion of the obvious—that commercials help support children's television programming—scarcely justifies elimination of all children's television commercialization guidelines. The FCC's quantitative commercialization guidelines never *eliminated* commercials from children's television. As the Commission itself pointed out in 1974, "[a]lthough advertising should be adequate to insure that the station will have sufficient revenues with which to produce programming which will serve the children of its community meaningfully, the public interest does not protect advertising which is substantially in excess of that amount." *1974 Report,* 50 F.C.C.2d at 12. The FCC has not found, say, that present levels of children's programming are inadequate; that additional commercialization is necessary to provide greater diversity in children's programming; or that increased levels of children's television commercialization pose no threat to the public interest. Bereft of bolstering findings of this sort, the Commission's invocation of the obvious fact that commercials pay the tab for children's programming hardly explains the leap to a "hands off" commercialization policy.

Tellingly, the Commission makes only a halfhearted attempt before us to demonstrate that its abbreviated explanation passes APA muster. Most of its effort is given over to an attempt to show that two critical predicates for the children's television commercialization guidelines have disappeared and that the guidelines therefore collapse of their own weight. The troubling implication of this argument, of course, is that the Commission could have eliminated its longstanding children's television commercialization guidelines without any explanation. That implication is, needless to say, profoundly wrong. *See* text *supra* at 8–10; *State Farm,* 463 U.S. at 43, 103 S.Ct. at 2866. *Greater Boston,* 444

---

4. The FCC has provided such an explanation for its deregulation of children's programming in the radio realm. *See Report and Order,* 84 F.C.C.2d 968 (1981).

5. As petitioners point out, the FCC in fact *continues* to recognize that market forces do not operate effectively in the children's television realm. In its revision of the 1984 Report, the Commission specifically maintains its strictures on separation of program and commercial content and its ban on "host-selling." *Revision,* 104 F.C.C.2d at 371 n. 41. These actions rest on the 1974 Report's basic findings, discussed above. Given this tacit recognition of market failure, the FCC owes the public a more substantial explanation of deregulation than it has given.

F.2d at 852. In any event, the Commission's recently unearthed "predicates" for the commercialization policy do not survive careful examination.

*First,* the FCC argues that the existence of children's television commercialization guidelines depended on the existence of the overall television commercialization guidelines. If so, the Commission points out, then general elimination of the industry-wide guidelines made it entirely appropriate (and perhaps even necessary) to eliminate the children's guidelines. For this proposition, the Commission trumpets language from the 1974 Report that at first glance seems to characterize the children's television policy as merely an appendage to the overall policy: "If our policy against overcommercialization is an important one ... it is particularly important in programs designed for children." *1974 Report,* 50 F.C.C.2d at 11.

Upon analysis, however, this argument falls flat, in view of the long history of the Commission's separate treatment of the children's television policy. We can discern no concrete evidence in that history or, for that matter, in the quoted language from the 1974 Report that renders the children's television policy's existence merely a function of the overall television guidelines' existence. To the contrary, the FCC has repeatedly indicated that unique difficulties obtain in children's television regulation and has acted on those perceived difficulties in proceedings clearly distinct from general television policy proceedings. As the agency has seen it, kids are different; the Commission cannot now cavalierly revoke its special policy for youngsters without reexamining its earlier conclusions.

*Second,* the Commission claims that the existence of children's guidelines depends on the existence of NAB's self-imposed commercialization standards. Pointing to language in the 1974 Report "deferring" to industry self-regulation, the Commission contends that the children's guidelines never amounted to a formal FCC policy with any independent content. Rather, as FCC counsel sees it, the 1974 Report was merely the FCC's way of signifying its approval of the NAB guidelines. As the NAB abolished its commercialization standards in 1982 as part of an antitrust consent agreement with the federal government, *see United States v. National Association of Broadcasters,* 553 F.Supp. 621 (D.D.C. 1982), the argument goes, the Commission's action formally eliminating the children's guidelines was entirely justified, if indeed not required.

For two reasons, we are unpersuaded. First, the FCC's rationale comes well after the fact. At the time of the antitrust consent decree, the Commission did nothing to alter its application of the children's guidelines. Rather, it behaved as if the decree had no effect on its television commercialization policies. Second, and more fundamentally, the Commission offers nothing to suggest a perceived indissoluble link between the NAB standards and the children's television guidelines. A dispassionate reading of the 1974 Report leads more naturally to the conclusion that the Commission adopted the NAB standards as a convenient reference point for its own policy, not that it declined to fashion an independent policy. Indeed, the FCC has given every indication that the 1974 Report represents a statement of independent policy. *See 1974 Report,* 50 F.C.C.2d at 11. In light of these facts, we are unwilling to embrace the notion that the Commission's voluminous "Children's Television Report and Policy Statement" was, after all, only a bureaucratic tale "full of sound and fury, signifying nothing." [6]

### III

The Commission's decision to relax program logkeeping requirements presents an altogether different question. Although the FCC plainly enjoys authority to promulgate whatever recordkeeping requirements it deems appropriate, the Commission is nonetheless obliged to provide a reasoned

---

6. W. Shakespeare, Macbeth, Act V, Sc. 5, lines 32–33. Indeed, the FCC's 1974 Report runs 50 type-set pages. *See* 50 F.C.C.2d 1–50 (1974).

basis for material changes in its record-keeping policy. *See State Farm*, 463 U.S. at 46, 103 S.Ct. at 2868; *Office of Communication of United Church of Christ v. FCC*, 779 F.2d 702, 707 (D.C.Cir.1985). The question is whether it has done so. To answer the question, we turn briefly to the history of television stations' historical records.

Prior to the 1984 rulemaking, television licensees were obligated to maintain "comprehensive" logs of their programming and commercial broadcasts. With the general deregulation of television programming and commercialization, however, the Commission replaced this comprehensive logging duty with the less burdensome requirement that licensees maintain quarterly lists of issue-oriented programming, lists that are to include those programs the licensee believes contain its most "significant" treatment of public questions.

ACT alleges that these relaxed requirements are "arbitrary and capricious" in several respects. First and foremost, ACT asserts that the Commission considered only the informational needs of those seeking to *deny* a station its license, not the needs of those seeking to *supplant* a licensee in a "comparative renewal" hearing. Second, it alleges that the shift from "comprehensive" logs to "exemplary" lists will not actually reduce regulatory burdens because stations will continue to maintain comprehensive logs in anticipation of possible comparative renewal battles. Third, ACT argues that the Commission improperly failed to consider the alternative policy of requiring stations to make available to the public any "voluntarily" maintained program logs.

At the outset of this branch of our inquiry, we can readily dispose of the claim that the FCC impermissibly failed to evaluate a viable alternative policy, to wit, mandatory public assess to "voluntarily" maintained program logs. Petitioners are correct that the Commission did not consider

this approach in either its 1984 Report or its revision of that Report. Try as we might, however, we are unable to find in the record of proceedings before the Commission any mention of the suggested alternative policy now so strenuously championed by petitioners.

■ It is beyond cavil that an agency must examine significant policy alternatives in order to come to "reasoned" regulatory decisions. *State Farm*, 463 U.S. at 46, 49–51, 103 S.Ct. at 2868, 2869–70. Nevertheless, agencies are neither expected nor required to be clairvoyant and to anticipate alternatives that might be raised in subsequent judicial proceedings. *See id.* at 51, 103 S.Ct. at 2870; *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 551, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1978). Indeed, Congress saw fit to codify this sensible requirement as to the Commission in 47 U.S.C. § 405:

> The filing of a petition for reconsideration shall not be a condition precedent to judicial review of [an FCC decision] except where the party seeking such review ... relies on questions of fact or law upon which the Commission ... has been afforded no opportunity to pass.

This court has consistently construed section 405 to preclude judicial consideration of arguments not advanced before the Commission. *See, e.g., Washington Association for Television & Children v. FCC*, 712 F.2d 677, 681 (D.C.Cir.1983); *American Radio Relay League, Inc. v. FCC*, 617 F.2d 875, 879 n. 8 (D.C.Cir.1980). Nothing more need be said to warrant upholding the Commission for its "failure" to examine this latter-day claim.[7]

In evaluating petitioners' two remaining arguments, we think it of no little relevance that the Commission has adopted for television stations precisely the recordkeeping requirements established in the FCC's deregulation of radio broadcasting. Those

---

7. Moreover, counsel for intervenor CBS represents to the court that making even voluntarily-maintained program logs available to the public involves significant, if not onerous, expenditures of administrative effort. Counsel points

out, persuasively, that collation of scattered logs can be an extraordinarily time-consuming proposition. This bolsters our reluctance to step in to reverse the Commission on this proposed alternative policy.

requirements reflect in substantial part specifications articulated by this court in two prior rounds of judicial review. *See Office of Communication of United Church of Christ v. FCC,* 707 F.2d 1413 (D.C.Cir.1983) (*"UCC III"*); *Office of Communication of United Church of Christ v. FCC,* 779 F.2d 702 (D.C.Cir.1985) (*"UCC IV"*). In the television and radio contexts alike, the Commission justified relaxing program log requirements on the ground that general elimination of quantitative programming and commercialization guidelines makes comprehensive logging unnecessary. We have previously had occasion to suggest that this rationale is adequate in radio if the replacement recordkeeping procedure adequately provides for essential information to challengers. *See UCC IV,* 779 F.2d at 714 ("significant treatment" approach "tailor made" to qualitative evaluation of programming). The Commission has embraced the same approach in television broadcasting.

ACT distinguishes *UCC III* and *UCC IV* on the basis of the differences between radio and television markets. The Commission, as ACT sees it, cannot adopt the radio recordkeeping system for television because television stations exist in far smaller numbers than do radio stations in any given geographical market. ACT fails to buttress, however, its rather counter-intuitive notion that the comparatively small number of television stations somehow makes more stringent recordkeeping a necessity. What is more, ACT identifies no logical link between the two considerations, and in reflecting on the matter, we are at a loss to identify any such link.

Indeed, to the extent a connection exists between the small number of television stations and proper levels of program logkeeping, the linkage tends to cut against ACT's position. As CBS points out, the small number of television stations renders program monitoring by private parties substantially easier than comparable monitoring of the considerably more numerous radio stations. We are reluctant to overturn the Commission's transplanting of radio recordkeeping requirements to the television area in the absence of strong indications that those requirements are somehow inadequate.

With this observation in mind, we turn to petitioners' two remaining challenges. First, petitioners find fault in the Commission's alleged failure to consider the special informational needs of challengers who seek to *take over* a station's license, rather than simply *deny* that license. ACT points out that in petitions to deny a license, an incumbent licensee need only have provided "minimal" public service to retain its license, *Black Citizens for a Fair Media v. FCC,* 719 F.2d 407; 411 (D.C.Cir.1983), whereas in comparative renewals the incumbent must have provided "substantial" service. *Central Florida Enterprises v. FCC,* 683 F.2d 503, 507 (D.C.Cir.1983). Petitioners argue that this difference in standards requires the FCC to provide for greater information flow to challengers in comparative renewal proceedings. They also note that *UCC III* and *ICC IV* only dealt with petitions to deny, not comparative renewals, and thus, they assert, the two opinions provide no succor to the Commission.

██ The FCC counters with two responses, which together convince us that it has adequately justified its action. First, even assuming that comparative renewals require a greater information flow, the Commission observes that additional information is available to comparative challengers through discovery proceedings after the challenge has been filed.[8] The issues/programs lists are a challenger's exclusive source of programming information only *prior* to filing a challenge. Consequently, as the FCC points out, the real issue here is whether the issues/programs lists are adequate to enable a potential challenger to

---

8. The FCC finds support in *UCC IV* on this issue. "Such discovery proceedings might obviate any problems presented by the issues/program list in the context of a comparative renewal hearing." 779 F.2d at 709 n. 8. Granted, the language is conditional, but the Commission's point is well taken. *See also 1984 Report,* 98 F.C.C.2d at 110 (discussing availability of discovery/FCC assistance to challenges).

determine *which* of several station licensees might be most vulnerable to attack. We see no grounds for overturning the Commission's determination that the lists provide sufficient information in that more limited respect.

Second, the Commission points out that it is far from clear that challengers in comparative renewal proceedings actually require more information than do petitioners to deny. While the burden of proof falls on the *challenger* in the latter category, the burden is on the *licensee* in comparative renewals. This difference tends to cancel out any information effect different standards of review might have. Thus, though *UCC III* and *UCC IV* are primarily concerned with petitions to deny, the logic of those opinions applies in substantial part to the comparative renewal context.

In light of these arguments, as well as the FCC's careful adherence to this court's general pronouncements with respect to recordkeeping in *UCC III* and *UCC IV*, we are satisfied that the Commission's explanation is adequate to demonstrate that its new recordkeeping requirements meet the information needs of challengers in comparative renewal proceedings.

Finally, ACT argues that the Commission's action is arbitrary and capricious because it reduces information flow to the public but fails to produce any meaningful reduction in regulatory burden for television stations. Because stations will continue to maintain comprehensive logs in anticipation of possible comparative renewal hearings, the mere elimination of the formal comprehensive recordkeeping requirement makes no difference to the total regulatory burden.

This position mirrors an argument advanced and rejected in the radio deregulation proceedings. The Commission explicitly referred to those proceedings in its explanation of its action in the present case and indicated that it rejected the argument on the same grounds. *Revision*, 104 F.C.C.2d at 371–72. The issues are identical in the radio and television contexts, as evidenced by the fact that petitioners make no effort to distinguish the radio deregulation

proceedings. The Commission's reference to its earlier explanation is therefore adequate to dispose of the point. *See Committee to Save WEAM v. FCC*, 808 F.2d 113, 118 (D.C.Cir.1986) (reference to other clearly relevant sources is sufficient to meet "necessary articulation" requirements).

## IV

In sum, we find that the Commission has failed to explain adequately the elimination of its long-standing children's television commercialization guidelines, and we therefore remand to the Commission for elaboration on that issue. We discern no such flaw in the Commission's explanation of its relaxation of television programming logkeeping requirements, and consequently uphold its action in that respect.

*Judgment accordingly.*